The JOHN BLAIR COMMUNICATIONS, INC. PROFIT SHARING PLAN, and Sanford Ackerman and Timothy McAuliff in their Capacity as Members of the John Blair Communications, Inc. Profit Sharing Plan Committee and Individually, Plaintiffs,

v.

TELEMUNDO GROUP, INC. PROFIT SHARING PLAN, Telemundo Group, Inc. Profit Sharing Plan Committee, and Peter Housman II, Henry Silverman, and Donald Raider, Defendants.

Nos. 90 Civ. 5499 (MGC).

United States District Court, S.D. New York.

March 31, 1993.

Rosenman & Colin, New York City, for plaintiffs; by Joel W. Sternman, Sanford Hausler.

Dewey Ballantine, New York City, for defendants; by Jack Kaufmann, Susan C. Meaney.

## OPINION AND ORDER

CEDARBAUM, District Judge.

This is an action arising under provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.* The John Blair Communications, Inc. Profit Sharing Plan (the "New Blair Plan") and two members of the committee that administers the New Blair Plan [1] assert claims against Telemundo Group, Inc. Profit Sharing Plan (the "Telemundo Plan"), the committee that administers

the Telemundo Plan (the "Telemundo Committee"), and three members of the Telemundo Committee for earnings on investments that plaintiffs claim were wrongfully withheld from them. Plaintiffs and defendants have submitted the case for all purposes for determination by the Court on undisputed facts.

## THE CLAIMS

Plaintiffs claim that defendants breached a plan administrator's fiduciary duty under ERISA in two respects in calculating the accounts of participants in the New Blair Plan. Plaintiffs do not allege any deliberate misconduct or improper delay on the part of defendants in carrying out their duties. The issues raised are of statutory duty and not of overreaching.

The first claim is that in transferring assets to the New Blair Plan, defendants were required to credit appreciation of assets between the valuation date and the dates on which the actual transfers were effected. Plaintiffs' second grievance is that defendants gave effect to an election to transfer account balances from the Equity Fund to the Short Term Investment Fund as of the effective date of the election even though the actual transfers took place at a later date.

For the reasons discussed below, judgment is awarded to defendants in this action.

## THE UNDISPUTED FACTS

On April 10, 1987, JHR Acquisition Corp., now known as John Blair Communications, Inc. ("New Blair"), acquired divisions of John Blair & Company, now known as Telemundo Group, Inc. ("Telemundo"). In accordance with the Asset Purchase Agreement (the "Agreement") that governed the acquisition, John Blair & Company's profit sharing plan (the "Old Blair Plan") was split, or "spun off," into two plans, the New Blair Plan and the Telemundo Plan.

The New Blair Plan, the Telemundo Plan, and the Old Blair Plan were defined contribution plans. A defined contribution plan is one in which each participant has an individ-

---

1. Although the two members of the New Blair Plan committee sue both as members of the committee and as individuals, plaintiffs are not asserting any individual claims.

ual account and each participant's benefits are based solely upon the amount contributed to that participant's account and any earnings or losses thereon. 29 U.S.C. § 1002(34).

Upon the closing of the acquisition on April 10, 1987, approximately 500 of the 650 participants in the Old Blair Plan (the "transferred employees") became participants in the New Blair Plan. Those who were not transferred to the New Blair Plan became participants in the Telemundo Plan.

### 1. The "Transfer Dates Claim"

In order to effect the plan split, § 17.7 of the Agreement provides that

[a]t or prior to the Closing Date, Seller shall split up the [Old Blair Plan] into two substantially similar profit sharing plans, one of which shall cover and be for the exclusive benefit of the Transferred Employees who participate therein (the "[New Blair Plan]"). The [New Blair Plan] shall provide that the transfer of employment of the Transferred Employees on the Closing Date will not be considered a termination of service for purposes of the [New Blair Plan]. Effective as of the Closing Date, Buyer shall adopt ... [the New Blair Plan].... As soon as is practicable after the Closing Date, Buyer shall cause an application to be made to the IRS for a favorable determination letter (the "Letter") with respect to the adoption of the [New Blair Plan].

Promptly after the end of the calendar quarter (the "Valuation Date") in which Buyer delivers to Seller a copy of the Letter, Seller shall cause to be transferred, in kind, from the trust under the [Old Blair Plan] to the new trust under the [New Blair Plan] the full amount of account balances in the [New Blair Plan] of all Transferred Employees whether or not such employees are vested. Each such account balance shall be adjusted to reflect investment experience (as well as distributions, expenses and contributions) under the existing [Old Blair Plan] trust from the Closing Date through the Valuation Date. If Buyer is unable to obtain the Letter, the [New Blair Plan] shall be terminated.

Under the terms of this provision, all assets of the New Blair Plan continued to be maintained in the Telemundo Plan trust and administered by the Telemundo Committee pending the delivery by New Blair of a favorable determination letter from the IRS. On February 19, 1988, New Blair obtained approval from the IRS for the New Blair Plan on condition that it adopt certain amendments to the Plan. By letter dated April 15, 1988, New Blair delivered copies of the required amendments to Telemundo.

As required by the Agreement, Telemundo proceeded to value the assets held in the Telemundo Plan trust in respect of the account balances of the New Blair Plan participants as of June 30, 1988, the last day of the quarter during which IRS approval had effectively been obtained (the "valuation date"). These assets, held in four investment vehicles, were valued as follows: $14,520,341.80 in the Short Term Investment Fund; $7,766,-569.98 in the Equity Fund; 63,785.91 shares of ADVO stock; and 52,941.546 debentures of J.B. Acquisition Corp. (the "valuation amounts").

On October 14, 1988, the Telemundo trustee transferred the valuation amount of the Short Term Investment Fund assets in cash to the New Blair Plan trust. During December 1988, the trustee transferred the valuation amounts of the ADVO stock and the J.B. debentures in kind to the New Blair Plan trust. The assets of the Equity Fund were held in two separate investment accounts managed by Beck, Mack & Oliver and Froley Revy Investment Co., Inc., respectively. The Telemundo trustee arranged for the transfer to the New Blair trust of cash and securities equalling one half of the valuation amount of the Equity Fund from each of these accounts (thus totalling the full valuation amount of the Equity Fund). These transfers took place in November and December of 1988. The assets transferred to the New Blair Plan in October, November, and December 1988 did not include interest on or appreciation of the assets between the valuation date and the dates on which the actual transfers took place.

## 2. The "Equity Fund Claim"

Section 17.7 of the Agreement provides that

[u]ntil the transfer of all account balances to the trust under the [New Blair Plan] has been carried out, benefits with respect to such account balances shall continue to be paid from the [Old Blair Plan] trust in accordance with the terms of the [New Blair Plan] and such account balances shall continue to be invested in the manner currently permitted under the [Old Blair Plan] and pursuant to the elections of the [New Blair Plan] participants.

Pursuant to this provision, approximately 250 of the New Blair Plan participants (the "electing participants") elected at the end of 1987 to transfer all or a portion of their account balances from the Equity Fund to the Short Term Investment Fund. Telemundo credited and debited the electing participants' Short Term Investment Fund and Equity Fund accounts, respectively, as of December 31, 1987 to reflect the elections, and after that date, determined the account balances of the electing participants by the investment experience of the funds elected.

Telemundo did not actually transfer the $8,941,210.80 of assets which the electing participants chose to transfer from the Equity Fund to the Short Term Investment Fund until October of 1988. During the roughly ten-month period from the date on which the elections became effective until the actual transfers, the Equity Fund appreciated at a higher rate than the Short Term Investment Fund. Plaintiffs describe the result as a "surplus" in the Equity Fund.

Section 5.5 of the Old Blair Plan provides as follows:

Semiannually as of June 30 and December 31 of each Year and as of such other dates as the Committee shall direct, the Trustee shall value the assets of those portions of the trust Fund represented by all Short Term Investment Accounts and Equity Accounts, excluding, pursuant to directions of the Committee, any Employer contributions ... or forfeitures for such Year and any current charges against such Short Term Investment Accounts and Equity Accounts. If the value of all Short Term Investment Accounts and Equity Accounts as so determined, excluding, however, any such Short Term Investment Account or Equity Account not in existence as of the next preceding Valuation Date, differs from the value of such Short Term Investment Accounts and Equity Accounts as of the next preceding Valuation Date, any excess or deficiency, as the case may be, shall be credited or charged to such respective Short Term Investment Accounts or Equity Accounts as of such later Valuation Date in the ratios that their respective balances as of such next preceding Valuation Date bore to their then aggregate balances.

By resolution dated December 28, 1988, Telemundo's board of directors amended the Telemundo and Old Blair Plans retroactively so that from January 1, 1987 through January 1, 1989 any excess funds resulting from delays of more than 60 days in transferring assets pursuant to participants' elections were to be treated in the same manner as employer contributions to the plans. The amended Telemundo Plan received a favorable determination letter from the IRS dated August 25, 1989.

On December 31, 1988, the "surplus" in the Equity Fund was allocated to the accounts of participants in the Telemundo Plan as an employer contribution.

## DISCUSSION

### 1. The "Transfer Dates Claim"

Plaintiffs assert two claims. The first, referred to by the parties as the "transfer dates claim," seeks gains which accrued on the assets transferred to the New Blair Plan between the valuation date and the actual transfer dates in the latter part of 1988. Plaintiffs claim that by failing to transfer these gains to the New Blair Plan, and instead allocating this "surplus" to the Telemundo Plan, defendants violated §§ 404, 406, and 208 of ERISA, 29 U.S.C. §§ 1104, 1106, 1058. Plaintiffs have not shown and do not even allege that the delay in transferring the assets was either undue or intentional.

Defendants respond that their treatment of the assets was specifically authorized by the Agreement and, in any event, did not violate ERISA. Section 17.7 of the Agreement provides that the account balances of the New Blair employees were to be transferred to the New Blair Plan "[p]romptly" after the valuation date and that these account balances were to be "adjusted to reflect investment experience (as well as distributions, expenses and contributions) under the existing [Old Blair Plan] trust from the Closing Date through the Valuation Date." Thus, the language of the Agreement did not require defendants to account for the investment experience from the date of valuation to the dates the assets were actually transferred.

■■■■ Trust documents cannot excuse trustees from their duties under ERISA. *See* 29 U.S.C. § 1104(a)(1)(D); *Central States, Southeast v. Central Transport, Inc.*, 472 U.S. 559, 568, 105 S.Ct. 2833, 2839, 86 L.Ed.2d 447 (1985). Therefore, regardless of the Agreement, and even if plaintiffs were treated as parties to the Agreement, the transfer must meet the requirements of ERISA.

In support of their claim, plaintiffs rely on two provisions of ERISA, 29 U.S.C. §§ 1104(a) and 1106, which set forth general obligations of plan fiduciaries. Section 1104(a)(1) provides in pertinent part that

a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan. . . .

Section 1106(a), entitled "Transactions between plan and party in interest," states as follows:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

. . . .

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan

. . . .

A "party in interest" includes a fiduciary, plan administrator, or employer whose employees are covered by the plan. 29 U.S.C. § 1002(14). Subsection (b), "Transactions between plan and fiduciary," requires that a "fiduciary with respect to a plan shall not— (1) deal with the assets of the plan in his own interest or for his own account."

Plaintiffs also argue that 29 U.S.C. § 1058, the ERISA provision which specifically applies to a transfer of assets from one plan to another, entitles them to the gains on the assets transferred. Section 1058 states:

A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan after September 2, 1974, unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had then terminated).

■■■■ Plaintiffs argue that these three distinct ERISA provisions regulate defendants' transfer of assets to the New Blair Plan. Sections 1104 and 1106 are broadly-worded provisions that deal generally with plan fiduciaries' responsibilities. Section 1058, by contrast, deals specifically with the situation in which one plan transfers its assets to another plan. In statutory construction, a specific statutory provision usually takes precedence over a general one. *Radzanover v. Touche Ross & Co.*, 426 U.S. 148, 153–57, 96 S.Ct. 1989, 1992–94, 48 L.Ed.2d 540 (1976). Based on this principle, courts that have looked at the issue have concluded that, in the context of a transfer of assets or liabilities from one plan to another, a plan administrator need only meet the specific requirements of § 1058 to satisfy his obligations under ERISA. *See, e.g., Bigger v. American Commercial Lines*, 862 F.2d 1341, 1344–47 (8th Cir.1988) (holding that § 1058, not § 1104, defines a plan administrator's duties

in a spinoff). *See also Dougherty v. Chrysler Motors Corp.*, 840 F.2d 2, 4 (6th Cir.1988).

The Secretary of the Treasury has been granted authority to promulgate regulations under 29 U.S.C. § 1058. Reorganization Plan No. 4 of 1978 § 101(a). *See Van Orman v. American Ins. Co.*, 608 F.Supp. 13, 28 n. 3 (D.N.J. 1984). Treas.Reg. § 1.414(*l*)–1(m) provides:

> In the case of a spinoff of a defined contribution plan, the requirements of section 414(*l*) will be satisfied if after the spinoff—
>
> (1) The sum of the account balances for each of the participants in the resulting plans equals the account balance of the participant in the plan before the spinoff, and
>
> (2) The assets in each of the plans immediately after the spinoff equals the sum of the account balances for all participants in that plan.

26 C.F.R. § 1.414(*l*)–(m). Under Treas.Reg. § 1.414(*l*)–1(b)(11), the following factors are relevant but not necessarily controlling in determining the effective date of a spinoff:

> (i) The date on which the affected employees stop accruing benefits under one plan and begin coverage and benefit accruals under another plan.
>
> (ii) The date as of which the amount of assets to be eventually transferred is calculated.
>
> (iii) If the merger or spinoff agreement provides that interest is to accrue from a certain date to the date of actual transfer, the date from which such interest will accrue.

26 C.F.R. § 1.414(*l*)–1(b)(11). These regulations govern the issue at hand.

■ The second factor of Treas.Reg. § 1.414(*l*)–1(b)(11) (the "date as of which the amount of assets to be eventually transferred [was] calculated") refers to the valuation date provided in the Agreement as the spinoff date of the New Blair Plan. It is clear from this provision that ERISA contemplates that a spinoff date may precede the actual transfer of assets to the new plan. Courts evaluating spinoffs have acknowledged the practical necessity of having the actual transfer of

assets take place after the effective date of a spinoff. *See, e.g., Bass v. Retirement Plan of Conoco, Inc.*, 676 F.Supp. 735, 748 (W.D.La. 1988); *Bigger v. American Commercial Lines*, 862 F.2d 1341, 1348 (8th Cir.1988).

Section 1058 and Treas.Reg. § 1.414(*l*)–1(m), the corresponding regulation, clearly require that employee benefits not be reduced as a result of a spinoff. Ideally, a transferor plan in a spinoff would transfer the assets on the date of the spinoff. Since this is not possible in practice, the question is whether defendants' failure to transfer the appreciation of the assets between the spinoff (*i.e.,* valuation) date and the actual transfer dates amounted to a reduction of the New Blair employees' benefits. This question cannot be answered by reference to the plain language of the statute or the regulation because they are silent on this issue.

The parties have found no cases involving a delayed transfer of assets in the context of a spinoff of a defined contribution plan, but they have located two cases involving a delayed transfer of assets in a spinoff of a defined benefit plan. These cases point in different directions. In *Bigger v. American Commercial Lines*, 862 F.2d 1341 (8th Cir. 1988), the plaintiffs' participants in the spun-off plan, claimed that the amount of assets transferred to the spun-off plan should not be affected by the asset depreciation that occurred between the spinoff and the actual transfer of the assets. The court held that the company that administered the transferor plan met the requirements of § 1058 when it accounted for the changes in value of the assets between the spinoff and the transfer of the assets. *Id.* at 1348.

*Koch Indus., Inc. v. Sun Co., Inc.,* 918 F.2d 1203 (5th Cir.1990), however, seems to take the position that the Treasury Regulations only require that the assets eventually transferred to the spun-off plan equal the benefits accrued at the time of the spinoff. In *Koch,* the plaintiff, who had assumed liability for the spun-off defined benefit plan, argued that the company that administered the transferor plan had violated § 1058 and the related Treasury Regulations by not transferring interest on the assets for the time period between the spinoff date and the

actual transfer date. The court equivocated on the issue by holding that the money actually transferred to the spun-off plan satisfied the Treasury Regulations "even if those regulations had required interest," but added that "the payment of interest is not dictated by ERISA." *Id.* at 1207.

The language of Treas.Reg. § 1.414(*l*)-1(11)(iii), which identifies one factor relevant to determining the spinoff date, provides some guidance. This regulation provides as follows: "If the merger or spinoff agreement provides that interest is to accrue from a certain date to the date of actual transfer, the date from which such interest will accrue." Thus, the regulation seems to contemplate a transfer of assets after the spinoff date without accounting for changes in the value of the assets.

Additionally, an instructive analogy may be made between this case and the treatment under ERISA of involuntary termination of employment. In *Ganze v. Dart Indus., Inc.,* 741 F.2d 790 (5th Cir.1984), the plaintiff argued that he was entitled to a cash dividend from the company profit sharing plan which was declared two weeks after his employment was terminated. The court upheld the denial of the dividend on the ground that the plaintiff's entitlement was limited to the amount credited to his account as of the last valuation date, which was before the dividend declaration. *Id.* at 794 ("A terminated participant neither enjoys—nor suffers—changes in the value of fund assets which occur between the last valuation date and his date of termination.")

Involuntary termination of employment is analogous to a spinoff of a defined contribution plan in that both are initiated not by the employee but by the employer and the employee's interest in the fund is limited by the acts of the employer to the right to receive his or her account balance. ERISA permits a plan administrator to ignore changes in the value of assets after the last valuation date in accounting for the benefits of terminated employees. There appears to be no policy reason for treating plan spinoffs differently. Furthermore, under both the Telemundo Plan and the New Blair Plan, distribution of account balances to individuals whose employment had been terminated was made without regard to the investment experience of plan assets between the relevant valuation date and the actual date of distribution.

Finally, it is important to note that, because of the vagaries of the market, a rule that does not require a transferor plan to account for investment experience between the valuation and transfer dates does not, *a priori*, harm (or benefit) the employees in the spinoff. Indeed, if the assets had depreciated between the valuation and transfer dates, it is unlikely that plaintiffs would be challenging such a rule. Therefore, such a rule is not in conflict with the policy behind § 1058 and the regulations of ensuring that employee benefits are not reduced as a result of the spinoff.

For all the foregoing reasons, in a case in which there has been no allegation of undue or intentional delay, § 1058 does not require a transferor plan in a spinoff of a defined contribution plan to account for changes in the value of assets between the spinoff date and the actual dates of transfer.

### 2. The "Equity Fund Claim"

At the end of 1987, approximately 250 of the New Blair Plan participants elected to transfer all or a portion of their account balances from the Equity Fund to the Short Term Investment Fund effective December 31, 1987. Although the Telemundo Committee treated these participants' accounts by debiting and crediting their Equity Fund and Short Term Investment Fund account balances, respectively, to reflect the elections and the investment experience of these funds from December 31, 1987 onward, the Telemundo Committee did not actually transfer the Equity Fund assets into the Short Term Investment Fund until October 1988. During the roughly ten-month period before the actual transfers, assets held in the Equity Fund appreciated at a higher rate than those in the Short Term Investment Fund, thereby creating a "surplus," which was treated as an employer contribution. Plaintiffs argue that this was a breach of defendants' obligations under ERISA and the Old Blair Plan even though all participants in both the Telemun-

do and New Blair Plans were treated the same.

In their first Memorandum of Law, plaintiffs contend that the electing participants are entitled to the "surplus." This contention is without merit.

■ Section 1109 of Title 29 requires a plan fiduciary to restore to the plan any personal profits the fiduciary has made through use of plan assets in violation of his obligations under ERISA. Plaintiffs, however, have not shown that the delay in transferring the assets from the Equity Fund to the Short Term Investment Fund violated any provision of ERISA. In the cases cited by plaintiffs, employees suffered economic losses due to the failure of a plan administrator to act promptly on their instructions concerning the sale or transfer of assets. *See, e.g., Clarke v. Bank of New York*, 687 F.Supp. 863, 868 (S.D.N.Y. 1988) (failure to comply with plan's own guidelines concerning liquidation of participant's accounts resulted in lower yield); *Rex v. Lincoln Trust*, 5 Employee Benefits Cas. (BNA) 1138 (D.Colo. 1983) (failure to effectuate transaction for plaintiff's account caused plaintiff to lose money). Here, by contrast, since the account balances of the electing participants reflected the investment experience of the funds chosen from the effective date of elections, the electing participants are in the same position they would have been in had defendants transferred the assets on the day on which their elections became effective. These cases, therefore, do not support plaintiffs' position that the electing participants are entitled to recover as a result of the delay in the actual transfer of assets.

■ The Restatement (Third) of Trusts § 210(1)(b) is similarly inapposite. Section 210(1)(b) states that trust beneficiaries may affirm any investments improperly made by the trustee, thereby taking the gains from these investments. But this section deals with the situation in which the trustee made investments that were expressly prohibited. Plaintiffs have pointed to no provision of the Old Blair Plan (which governed the elections by New Blair participants, *see* § 17.7 of the Agreement) which defendants violated.

Plaintiffs also argue, without any supporting authority, that defendants violated § 1104(a) (obligation to administer plan solely in the interest of participants) and § 1106(a) (obligation not to transfer plan assets to a party in interest) and § 1106(b) (obligation not to deal with plan assets in own interest). ERISA, however, does not prohibit a plan fiduciary from being a participant in the plan so long as any benefit he or she receives is consistent with the terms of the plan as applied to all other participants. 29 U.S.C. § 1108(c). And plaintiffs do not even contend that the delay in transferring the assets was part of a plan on defendants' part to make use of the plan's assets for the benefit of someone other than the plan participants.

In their Reply Memorandum of Law, however, plaintiffs argue that the surplus in the Equity Fund should be allocated among the remaining New Blair Plan Equity Fund participants. In support of their position, plaintiffs point to § 5.5 of the Old Blair Plan.

■ A superficial reading of § 5.5 might support plaintiffs' position. The section calls upon the plan administrators to value the assets in the Equity and Short Term Investment Funds semiannually and credit or charge any change in the asset values from one valuation to the next to the accounts in these funds. Plaintiffs argue that this provision explicitly requires the Telemundo Committee to allocate the surplus to those who remained in the Equity Fund. The more reasonable interpretation of the section, however, is that it is meant to provide a mechanism whereby asset gains and losses occurring by virtue of the investment performance of the funds are allocated among the participants. The goal of the section seems only to credit or charge the accounts with the market performance of the investments that the participants have chosen, not to credit them with surpluses caused by an extraordinary event such as occurred here. Indeed, plaintiffs would get a windfall if they were to receive this surplus. If the Short Term Investment Fund had performed better than the Equity Fund, the accounts of participants in the Equity Fund could not have been reduced by the extra amount that Telemundo

would have been required to contribute to the Short Term Investment Fund.

Section 7.2(a) of the Old Blair and New Blair Plans gives the Plan administrators the right "to interpret the provisions of the Plan." Faced with this unforeseen circumstance, defendants treated the surplus as an employer contribution, which is how forfeitures are treated under these plans. In view of the fact that if the Short Term Investment Fund had outperformed the Equity Fund, Telemundo would have been required to fund the shortfall, this was a reasonable (perhaps the most reasonable) interpretation of the plan and thus should not be disturbed by a reviewing court. *See Pratt v. Petroleum Prod. Management, Inc. Employee Sav. Plan & Trust,* 920 F.2d 651, 662 (10th Cir. 1990). *Cf. Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989) (holding that a denial of benefits challenged under § 1132(a)(1)(b) is to be reviewed under a *de novo* standard unless the plan gives the fiduciary the discretion to interpret the plan's terms).

Since this was a reasonable interpretation of the original Plan without reference to the later *post hoc* amendment, it is not necessary to consider the propriety of the amendment.

## CONCLUSION

For the foregoing reasons, the Clerk is directed to enter judgment in this action for defendants.

SO ORDERED.