26 F.3d 360
 62 USLW 2794, 18 Employee Benefits Cas. 1325
 The JOHN BLAIR COMMUNICATIONS, INC. PROFIT SHARING PLAN, and
Sanford Ackerman and Timothy McAuliff in Their Capacity as
Members of The John Blair Communications, Inc. Profit
Sharing Plan Committee and Individually, Plaintiffs-Appellants,
v.
TELEMUNDO GROUP, INC. PROFIT SHARING PLAN, Telemundo Group,
Inc. Profit Sharing Plan Committee and Peter
Housman II, Henry Silverman and Donald
Raider, Defendants-Appellees.
 No. 342, Docket 93-7370.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 20, 1993.
Decided June 15, 1994.
 
 Joel W. Sternman, New York City (Philip B. Gerson, Rosenman & Colin, of counsel), for plaintiffs-appellants.
 Jack Kaufmann, New York City (Susan C. Meaney, Dewey Ballantine, of counsel), for defendants-appellees.
 Before: VAN GRAAFEILAND, WALKER, and JACOBS, Circuit Judges.
 WALKER, Circuit Judge:
 This is an action brought by The John Blair Communications, Inc. Profit Sharing Plan and members of the plan's committee (collectively "New Blair") against the Telemundo Group, Inc. Profit Sharing Plan, that plan's committee as well as individual members of the committee (collectively "Telemundo") for violations of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. Sec. 1001 et seq. ("ERISA").
 New Blair asserts two independent ERISA claims against Telemundo. First, in what has come to be referred to as the "Transfer Dates Claim," New Blair asserts that Telemundo violated its fiduciary duties when, during the spinoff of a predecessor defined contribution plan, the "Old Blair Plan," Telemundo transferred assets from the Old Blair Plan to New Blair, but failed to transfer any appreciation of these assets from the date they were valued until the date they were actually transferred. Second, in what has come to be known as the "Equity Fund Claim," New Blair alleges that Telemundo violated ERISA when it kept for its plan the surplus income earned during Telemundo's delay in transferring assets from an equity fund to a short term investment fund pursuant to elections of certain New Blair members.
 The parties submitted the case to the United States District Court for the Southern District of New York (Miriam Goldman Cedarbaum, Judge ) for disposition on a Stipulation of Undisputed Facts. See Uniroyal, Inc. v. Home Ins. Co., 707 F.Supp. 1368, 1372 (E.D.N.Y.1988) (Weinstein, J.). The district court entered judgment in favor of Telemundo on both of New Blair's claims, 816 F.Supp. 949.
 
 
 1
 For the reasons that follow, we reverse.
 
 GENERAL BACKGROUND
 
 2
 On April 10, 1987, JHR Acquisition Corp. acquired certain divisions of John Blair & Company ("Old Blair"), a diversified communications company. After the purchase of the Old Blair divisions, JHR was renamed John Blair Communications, Inc., and the remaining parts of Old Blair were renamed Telemundo Group, Inc. In accordance with the Asset Purchase Agreement (the "Agreement"), the Old Blair Plan, initially adopted in 1947, was split into the "New Blair Plan" and the "Telemundo Plan." Approximately 500 of the 650 Old Blair Plan participants became members of the New Blair Plan, and the remaining 150 became members of the Telemundo Plan.
 
 
 3
 Each of the plans involved in this case, the New Blair Plan, the Telemundo Plan, and the Old Blair Plan, fit within the definition of a "defined contribution" plan. A defined contribution plan is one in which the plan:
 
 
 4
 provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.
 
 
 5
 29 U.S.C. Sec. 1002(34). In other words, an individual plan member holds his or her own account and the eventual benefits received by the plan member are tied exclusively to the level of earnings on those funds during the life of the plan. Unless the plan possesses these features, it falls within the catch-all category known as "defined benefit" plans. 29 U.S.C. Sec. 1002(35). In contrast to defined contribution plans, members of defined benefit plans have no individual accounts and receive a fixed benefit upon retirement typically determined by a set formula. See Commissioner v. Keystone Consol. Indus., Inc., --- U.S. ----, ----, 113 S.Ct. 2006, 2009, 124 L.Ed.2d 71 (1993) (explaining the differences between defined benefit plans and defined contribution plans).
 
 DISCUSSION
 
 6
 Since the parties submitted the case to the district court on a Stipulation of Undisputed Facts, we review its decision de novo as we would a decision granting summary judgment. See May Dep't Stores Co. v. International Leasing Corp., 1 F.3d 138, 140 (2d Cir.1993).
 
 
 7
 I. The "Transfer Dates Claim"
 
 A. Factual Background
 
 8
 New Blair's first claim arises from the transfer of assets to New Blair by Telemundo. Telemundo acted throughout as interim trustee of the Old Blair Plan assets eventually destined for the New Blair Plan pending New Blair's receipt of a determination letter from the Internal Revenue Service ("IRS") approving the New Blair Plan. Section 17.7 of the Agreement stated the obligations of the parties once New Blair obtained the IRS letter:
 
 
 9
 Promptly after the end of the calendar quarter (the "Valuation Date") in which [New Blair] delivers to [Telemundo] a copy of the Letter, [Telemundo] shall cause to be transferred, in kind, from the trust under the [Old Blair Plan] to the new trust under the [New Blair Plan] the full amount of account balances in the [New Blair Plan] of all Transferred Employees whether or not such employees are vested. Each such account balance shall be adjusted to reflect investment experience (as well as distributions, expenses and contributions) under the existing [Old Blair Plan] trust from the Closing Date through the Valuation Date. If [New Blair] is unable to obtain the letter, the [New Blair Plan] shall be terminated.
 
 
 10
 New Blair duly received the IRS letter necessitating certain plan amendments, which were ultimately delivered to Telemundo on April 15, 1988. Consequently, as all agree, June 30, 1988 (the end of the calendar quarter) became the valuation date pursuant to the Agreement. Telemundo then valued as of June 30 the assets held in trust from the Old Blair Plan attributable to the individual account balances of the New Blair Plan participants. These assets, representing approximately 89% of the total Old Blair Plan assets held in trust by Telemundo, were in four investment vehicles. Assets in two of the four vehicles are relevant to the Transfer Dates Claim: $14,520,341.80 in the Short Term Investment Fund, and $7,766,569.98 in the Equity Fund, for a total of approximately $22.3 million as valued on June 30.
 
 
 11
 As to the assets in the Short Term Investment Fund, Telemundo valued the account balances of the New Blair members as of June 30, 1988 to reach the $14.5 million figure. On October 14, 1988, Telemundo transferred this amount in cash to New Blair, presumably by either transferring cash in the Fund or liquidating short term assets to raise cash. June 30 also marked the valuation date for those assets in the Equity Fund attributable to the New Blair members' accounts. This amount was approximately $7.7 million. On various dates during November and December, Telemundo transferred securities (with some cash) totalling $7.7 million. None of the transfers included interest on or appreciation of the assets between the valuation date and the actual transfer dates. At oral argument we were told by counsel for appellants that the fund assets, valued at $22.3 million as of June 30, gained approximately $500,000 in appreciation and interest during the time between valuation and transfer.
 
 B. Analysis
 
 12
 The question presented by the Transfer Dates Claim is whether, during the spinoff of a defined contribution plan, ERISA is violated by the failure to transfer the investment experience from the plan assets for the period from valuation date to actual transfer. This issue is one of first impression in this Circuit and appears not to have been addressed elsewhere.
 
 
 13
 We begin by examining Sec. 208 of ERISA, 29 U.S.C. Sec. 1058, which regulates the spinoff of ERISA benefit plans. Section 208 states in relevant part:
 
 
 14
 A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan after September 2, 1974, unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had then terminated).
 
 
 15
 Thus, it is quite plain that ERISA requires that a plan spinoff provide employees at least the same level of benefits "immediately after" the spinoff as they were entitled to "immediately before" the spinoff.
 
 
 16
 The regulation governing spinoffs of defined contribution plans parallels the statute. Rule-making authority under ERISA resides in the Treasury Department, see Van Orman v. American Ins. Co., 608 F.Supp. 13, 25 n. 3 (D.N.J.1984), and Treasury Regulation Sec. 1.414(1)-1(m) states:
 
 
 17
 Spinoff of a defined contribution plan. In the case of a spinoff of a defined contribution plan, the requirements of section 414(1) will be satisfied if after the spinoff--
 
 
 18
 (1) The sum of the account balances for each of the participants in the resulting plans equals the account balance of the participant in the plan before the spinoff, and
 
 
 19
 (2) The assets in each of the plans immediately after the spinoff equals the sum of the account balances for all participants in that plan.
 
 
 20
 26 C.F.R. Sec. 1.414(1)-1(m). Mirroring Sec. 208, the regulation requires individual account balances after the spinoff to be at least equal to the amounts before the spinoff.
 
 
 21
 The guiding principle of Sec. 208 and the accompanying regulation is benefit equivalence. At no point can the individual account balances be reduced as a result of the spinoff lest eventual benefits be adversely affected. In a case like this one, participants' eventual benefits will be materially affected if the appreciation amounts between valuation and actual transfer are not credited to their new accounts. Specifically, each of the 500 New Blair members will lose an average credit of $1,000 (as well as further income on this amount) if the $500,000 at issue is not credited to the accounts of the New Blair Plan. In other words, the loss arising from the delay comes directly out of the pockets of the individual plan members.
 
 
 22
 In our view, it is plainly inconsistent with Sec. 208 of ERISA for the accounts of the individual plan members to be "taken off the market" for four months. It is not difficult to see that if a company went through several different reorganizations over a given period, and consequently several plan spinoffs, an individual beneficiary's account could be deprived of several years' growth during repeated delays between asset valuations and transfers. Section 208 is designed to avoid this result.
 
 
 23
 Telemundo argues that another regulation relating to the determination of the date of a spinoff supports its actions in this case. Treasury Regulation Sec. 1.414(1)-1(b)(11), part of the general definitions applicable to the entire section on mergers, consolidations, and spinoffs (not just spinoffs of defined contribution plans), offers guidance in determining the date of a spinoff:
 
 
 24
 (11) Date of merger or spinoff. The actual date of a merger or spinoff shall be determined on the basis of the facts and circumstances of the particular situation. For purposes of this determination, the following factors, none of which is necessarily controlling, are relevant:
 
 
 25
 (i) The date on which the affected employees stop accruing benefits under one plan and begin coverage and benefit accruals under another plan.
 
 
 26
 (ii) The date as of which the amount of assets to be eventually transferred is calculated.
 
 
 27
 (iii) If the merger or spinoff agreement provides that interest is to accrue from a certain date to the date of actual transfer, the date from which such interest will accrue.
 
 
 28
 26 C.F.R. Sec. 1.414(1)-1(b)(11). Pointing to the second enumerated factor, Telemundo argues that the June 30, 1988 valuation date constitutes the date of the "spinoff," and that, since the assets were valued as of the spinoff date, the New Blair participants received on the transfer date the precise amount to which they were entitled. We believe that Telemundo's reading of the regulation would impermissibly contravene Sec. 208.
 
 
 29
 We first note that Telemundo's assumption that the June 30, 1988 valuation date would definitely be the applicable spinoff date is not supported by the regulation when read in the context of this case. For instance, Section 17.7 of the Agreement in this case provides, "[u]ntil the transfer of all account balances to the trust under the [New Blair Plan] has been carried out, benefits with respect to such account balances shall continue to be paid from the [Old Blair Plan]...." This language parallels subparagraph (i) of the regulation, under which the date of the spinoff could not have been before October 14, 1988, the date of the first transfer, because not before that time could New Blair's "affected employees stop accruing benefits under [the Old Blair Plan] and begin coverage and benefit accruals under [the New Blair Plan]." 26 C.F.R. Sec. 1.414(1)-1(b)(11)(i). That the regulation pertaining to the date of the spinoff points to different possible spinoff dates is not surprising. As mentioned above, this is a general definitional regulation designed to apply to mergers as well as spinoffs and to defined benefit plans as well as defined contribution plans. The drafters recognized the difficulties of pinpointing the moment of spinoff and explicitly stated that the factors listed in the regulation were not "necessarily controlling" but were merely intended for guidance, and that determination of the proper date depends upon "the facts and circumstances of the particular situation."
 
 
 30
 Even if we were to agree with Telemundo and select June 30, 1988 as the spinoff date under the statute and regulations, Telemundo would still be in violation of Sec. 208 because the amount "immediately after" the spinoff would fail to equal the amount "immediately before." If June 30 is considered the date of the spinoff, then the amount on July 1, 1988 "immediately after" that spinoff must be at least equal to the amount the prior day. It is undisputed that the plan assets equalled approximately $22.3 million as of June 30, 1988. Yet, only this amount was transferred some three to four months later. When one accounts for the time value of money, $22.3 million as of, say, October 14, 1988 is a considerably lesser amount on July 1, 1988. Thus, even accepting June 30, 1988 as the spinoff date, the central principle of Sec. 208 would be violated: the plan participants received less "immediately after" the spinoff--the discounted value of the $22.3 million paid out three and one-half months later--than they were entitled to "immediately before" the spinoff--$22.3 million in present value.
 
 
 31
 More particularly, as to the Short Term Investment Fund, Telemundo only transferred the $14.5 million that represented the account balances as of June 30, 1988, neglecting to include the investment experience of these short term assets during the intervening period. This meant that Telemundo had to liquidate fewer assets to meet the $14 million figure on October 14 than would have been required on June 30. Telemundo pocketed the difference which rightly belonged to the New Blair members. As to the Equity Fund assets, Telemundo followed a similar course. Telemundo transferred only $7.7 million worth of assets during November and December, even though the value of the same assets that led to the $7.7 million figure on June 30 had appreciated. Again, Telemundo kept the excess--equal to the value of the appreciation beyond the $7.7 million of the original assets. In sum, to the extent that Telemundo's reading of the regulation permits a lapse in which individual's accounts would cease to accrue gains, we reject it as contravening the plain statutory language of Sec. 208.
 
 
 32
 In analyzing the spinoff of a defined contribution plan under Sec. 208, courts should not be overly concerned with pinning down an exact date of spinoff, especially when the presence of numerous, drawn out transfers makes this a formidable task. Rather, courts must ensure that participants' accounts do not become stagnant. If accounts fail to reflect the investment experience during a transition period, and that experience yields a gain, the deprivation of the gain comes out of the pockets of the participants, and that is forbidden by Sec. 208. In this case, for instance, regardless of the spinoff date selected, the failure to reflect the gains during the interim period between valuation and transfer reduced the eventual benefits of the plan participants. We note that application of the rule requiring continuity in assets during spinoffs of defined contribution plans will not always yield a gain to the beneficiaries. For instance, if the value of a given group of securities happens to decrease between valuation and transfer, the beneficiaries would only be entitled to the lower value, just as if they had maintained continuous possession of them throughout the period. Furthermore, this rule requiring continuity in no way cabins the discretion of the fund managers in how they liquidate or transfer the plan assets; all it requires is that when the plan assets are eventually transferred or sold, the beneficiaries may not lose out on appreciation (or conversely be spared from any depreciation) that might have occurred after valuation but before transfer.
 
 
 33
 In conclusion, we believe that the transfer of assets in this spinoff violated Sec. 208 in that New Blair participants failed to receive an amount "immediately after" the spinoff that equalled the amounts in their accounts "immediately before" the spinoff because their accounts did not reflect the gains occurring during the interim period before the actual transfer.
 
 
 34
 Our conclusion is not altered by Telemundo's citation to cases involving the spinoff of defined benefit plans. Close scrutiny of these decisions only supports our reasoning in this case. In both Koch Industries, Inc. v. Sun Co., 918 F.2d 1203 (5th Cir.1990), and Bigger v. American Commercial Lines, 862 F.2d 1341 (8th Cir.1988), the courts examined the effect of a spinoff on defined benefit plan beneficiaries. Each case involved a situation where, like here, a predecessor plan retained the spunoff plan's assets for a period after the closing date of the reorganization. Examining the differences between defined benefit and defined contribution plans, both courts concluded that, unlike a defined contribution plan where a beneficiary's level of benefits depends on the assets retained in his or her individual account, with a defined benefit plan "the level of benefits does not depend on the amount of funds transferred." Koch, 918 F.2d at 1206; see also Bigger, 862 F.2d at 1345 ("The employees will receive no more than their fixed defined benefit regardless of the value of the assets in the plan."). In neither case did employees have "individual 'account balances' that depended on investment returns." Koch at 1207. In both cases, the new plans were contractually required to make up any shortfalls, and individual plan members were guaranteed the same level of benefits as before the spinoff regardless of when the plan assets were transferred. Thus, both courts ruled that Sec. 208 of ERISA was not violated.
 
 
 35
 We would agree with the able district judge's conclusion that there was no Sec. 208 violation if the Old Blair Plan were a defined benefit plan: it would matter little to the individual New Blair Plan members whether the plan lost out on roughly $500,000 as long as those members were guaranteed their promised benefits at retirement. See Bigger, 862 F.2d at 1344-45. The new plan could sustain the fractional loss due to administrative delay in transfer as long as the same level of benefits was assured. See Koch, 918 F.2d at 1206. However, because the level of benefits in a defined contribution plan is materially affected if the interim gains are not transferred, the analysis used in defined benefits cases is inapposite.
 
 
 36
 In conclusion, we hold that Telemundo's failure to transfer the gains attributable to the New Blair assets between the valuation date and dates of actual transfers violated the requirements of Sec. 208 of ERISA. Because of the special nature of a defined contribution plan in which the eventual benefits of a plan member depends entirely on the amount in his or her individual account, the failure to take account of this interim period violates the rule of benefit equivalence required under Sec. 208. Therefore, Telemundo must credit to the New Blair members the actual investment experience of the assets attributable to their accounts during the period between valuation and transfer.
 
 
 37
 We believe that Telemundo's violation of Sec. 208 also constituted a violation of its fiduciary duties under Sec. 404 of ERISA, 29 U.S.C. Sec. 1104. See Bigger, 862 F.2d at 1344 (remarking that Sec. 208 represents Congress's attempt "to clarify what conduct satisfies the fiduciary standards" in the context of transferring plan assets). Section 404 of ERISA states, inter alia, that
 
 
 38
 a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
 
 
 39
 (A) for the exclusive purpose of:
 
 
 40
 (i) providing benefits to participants and their beneficiaries ...
 
 
 41
 (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims....
 
 
 42
 29 U.S.C. Sec. 1104.
 
 
 43
 ERISA broadly defines the concept of fiduciary. See, e.g., Mertens v. Hewitt Assocs., --- U.S. ----, ----, 113 S.Ct. 2063, 2071, 124 L.Ed.2d 161 (1993); Donovan v. Mercer, 747 F.2d 304, 308 (5th Cir.1984). Under ERISA, anyone who, inter alia, "exercises any discretionary authority or discretionary control respecting" plan management or disposition of plan assets, or has "any discretionary authority or discretionary responsibility in the administration" of the plan, is deemed a fiduciary. See 29 U.S.C. Sec. 1002(21)(A). Telemundo conceded its fiduciary status in the district court when its counsel stated: "We were fiduciaries insofar as ERISA has certain requirements for how fiduciaries perform, that's right, and we have set forth obviously we've performed all of our fiduciary duties." Thus, by its own admission, Telemundo was in a fiduciary relationship with New Blair and its members during the interim period between asset evaluation and transfer.
 
 
 44
 Where fiduciary duties arise under ERISA, they must be enforced without compromise to ensure that fiduciaries exercise their discretion to serve all participants in the plan. See Williams v. Williamson-Dickie Mfg. Co., 778 F.Supp. 1197, 1198-99 (S.D.Ala.1991). As Judge Friendly aptly stated in Donovan v. Bierwirth, 680 F.2d 263 (2d Cir.), cert. denied, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982), Sec. 404 of ERISA requires that the decisions of a fiduciary "must be made with an eye single to the interests of the participants and beneficiaries." Id. at 271; cf. Developments in the Law--Nonprofit Corporations, 105 Harv.L.Rev. 1579, 1603 (1992) (describing the common law trustee's duty of loyalty as "demanding and inflexible").
 
 
 45
 During the interim period after the closing date of the acquisition but before the transfers of the plan assets, Telemundo was acting as trustee of both the Telemundo Plan and the New Blair Plan and thus was a dual fiduciary: it owed obligations of loyalty to the members of both plans. Yet, in the course of the transfer, Telemundo allocated 100% of the investment gains realized on the Old Blair assets during the period between valuation and actual transfer to the accounts of its own plan members, despite the fact that 90% of those Old Blair assets were attributable to New Blair members. Telemundo's duty of loyalty to its own plan members did not extend to giving them a windfall at the expense of the New Blair Plan participants. Its conduct was inconsistent with the strict duty owed to the New Blair participants. Therefore, we hold that Telemundo's actions in this case violated its fiduciary duties under Sec. 404 as well as the specific mandate of Sec. 208 of ERISA.
 
 
 46
 II. The "Equity Fund Claim"
 
 A. Factual Background
 
 47
 New Blair's second claim arises from events during the interim period when Telemundo was acting as trustee of the Old Blair Plan's assets. Under the Old Blair Plan, members had choices about where and in what amount to invest their account balances. Participants could allocate their accounts among three investment funds: the Short Term Investment Fund, the Equity Fund, and the Blair Common Stock Fund. Participants could change their selection on an annual basis by filing for an election by December 1, which would become effective thirty days later on December 31.
 
 
 48
 Section 17.7 of the Agreement provided that this practice of making elections would continue during the interim period:
 
 
 49
 Until the transfer of all account balances to the trust under the [New Blair Plan] has been carried out, benefits with respect to such account balances shall continue to be paid from the [Old Blair Plan] trust in accordance with the terms of the [New Blair Plan] and such account balances shall continue to be invested in the manner currently permitted under the [Old Blair Plan] and pursuant to the elections of the [New Blair Plan] participants.
 
 
 50
 Pursuant to this provision, and no doubt prompted by the severe stock market decline of October 1987, approximately 300 of the former Old Blair Plan members (250 of whom were New Blair Plan members) elected to transfer all or part of their account balances for the 1988 calendar year from the Equity Fund to the Short Term Investment Fund. As of December 31, 1987, the electing participants' accounts reflected these choices, and from that point the account balances were calculated to reflect these elections. However, the actual assets, valued at $8,941,210.80, were not physically transferred from the Equity Fund to the Short Term Investment Fund until October 14, 1988, nearly ten months later.
 
 
 51
 As it turned out, it would have been better for the plan members who elected to switch out of the Equity Fund to have remained in that fund at least over the short term. From December 1987 to October 1988, the Equity Fund appreciated at a greater rate than the Short Term Investment Fund. Because the electing participants' accounts reflected only the investment experience of the Short Term Investment Fund from December 31, 1987, a surplus was generated in the Equity Fund that appellants' counsel at argument told us was also approximately $500,000. On December 31, 1988, after the transfer of assets to New Blair was complete, Telemundo allocated the entire Equity Fund surplus to the Telemundo Plan as an employer contribution. New Blair argues that by such allocation Telemundo violated its fiduciary duty owed to the New Blair participants.
 
 B. Analysis
 
 52
 Telemundo claims that it violated no fiduciary duty because it had discretion to treat the Equity Fund surplus as an employer contribution to the Telemundo Plan. Telemundo cites provisions of the Old Blair Plan allowing the Old Blair Plan's trustees "to interpret the provisions of the Plan" and to "change or waive any requirements of the Plan to conform with law or to meet special circumstances not anticipated or not covered in the Plan." To further evidence its discretion, Telemundo directs us to certain plan amendments adopted on December 28, 1988, after the transfer of assets to New Blair was completed and just three days before Telemundo allocated the Equity Fund surplus to the Telemundo Plan as an employer contribution. One amendment provided that, for the period between January 1, 1987 and January 1, 1989, any excess funds resulting from delays of more than 60 days in transferring assets pursuant to participants' elections were to be treated as an employer contribution. Another amendment eliminated the option of Telemundo Plan members to elect which fund to invest their account balances. The amendments received a favorable determination letter from the IRS on August 25, 1989.
 
 
 53
 We note parenthetically that we are troubled by Telemundo's convenient adoption of the plan amendment allowing transfer surpluses to be allocated as employer contributions. Telemundo urges that the amendment did nothing more than clarify what the plan committee had within their discretion to do all along. If this is so, we question the necessity of the "clarification" since the possibility of a situation requiring application of the "clarification" was eliminated by the second amendment which foreclosed future inter-account transfers. In any event and wholly apart from Telemundo's intentions in adopting the plan amendments, a fiduciary's conduct must be judged in light of the plan in effect during the relevant period. See Pratt v. Petroleum Prod. Management, Inc. Employee Sav. Plan & Trust, 920 F.2d 651, 661 (10th Cir.1990). We think Telemundo's conduct must be evaluated in the context of the unamended plan. Telemundo is in no position to disagree since it acknowledges that these amendments had no retroactive effect.
 
 
 54
 Because the Old Blair and Telemundo Plans gave the plan committee discretion to interpret the provisions of the plan, Telemundo contends that its decision to allocate the Equity Fund surplus to the Telemundo plan must be upheld unless arbitrary and capricious. Telemundo cites the Supreme Court's decision in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), for support of this proposition.
 
 
 55
 We reject the argument that Firestone 's arbitrary and capricious standard applies to Telemundo's conduct in this matter. Firestone involved the denial of benefits, and the Court stated that if the terms of the plan accorded the administrator discretion in such matters, the decision should be upheld unless arbitrary and capricious. However, we decline to apply the arbitrary and capricious standard to the fiduciary conduct at issue here because this case does not involve a simple denial of benefits, over which the plan administrators have discretion. The distinction is satisfactorily explained in a pre-Firestone decision:
 
 
 56
 The use of different fiduciary standards in these cases is justified by the different challenge to fiduciary loyalty that each type of action presents. In actions by individual claimants challenging the trustees' denial of benefits, the issue is not whether the trustees have sacrificed the interests of the beneficiaries as a class in favor of some third party's interests, but whether the trustees have correctly balanced the interests of present claimants against the interests of future claimants.... In such circumstances it is appropriate to apply the more deferential "arbitrary and capricious" standard to the trustees' decisions. In the latter type of action, the gravamen of the plaintiff's complaint is not that the trustees have incorrectly balanced valid interests, but rather that they have sacrificed valid interests to advance the interests of non-beneficiaries.... [In such cases a court must] apply the strict statutory standards of ERISA.
 
 
 57
 Struble v. New Jersey Brewery Employees' Welfare Trust Fund, 732 F.2d 325, 333-34 (3d Cir.1984).
 
 
 58
 Firestone 's proposition that the more lenient arbitrary and capricious standard applies where the plan grants discretion to the administrators does not alter Struble 's holding that decisions that improperly disregard the valid interests of beneficiaries in favor of third parties remain subject to the strict prudent person standard articulated in Sec. 404 of ERISA. See Ches v. Archer, 827 F.Supp. 159, 165-66 (W.D.N.Y.1993) (rejecting argument that Firestone was controlling in a case involving the failure of plan administrators to enforce a contribution agreement); Trapani v. Consolidated Edison Employees' Mut. Aid Soc'y, Inc., 693 F.Supp. 1509, 1515 (S.D.N.Y.1988) (holding that the Firestone standard did not apply where "plaintiffs' claims extend to conduct beyond the mere balancing of interests among claimants through the payment or non-payment of certain claims"). Any other rule would allow plan administrators to grant themselves broad discretion over all matters concerning plan administration, thereby eviscerating ERISA's statutory command that fiduciary decisions be held to a strict standard.
 
 
 59
 In this case, New Blair's complaint extends "beyond the mere balancing of interests among claimants through the payment or non-payment of certain claims." Trapani, 693 F.Supp. at 1515. New Blair claims that Telemundo ignored the interests of the New Blair Plan members altogether in favor of the Telemundo Plan members. Such a claim is properly evaluated under the strict fiduciary duties of ERISA set forth in Sec. 404.
 
 
 60
 As stated above, during the period of transition between plans, the Telemundo committee acted as a dual fiduciary: it owed distinct duties to both the New Blair Plan members and the Telemundo Plan members; it could not grant preferences as between the two. See, e.g., Smith v. National Distillers and Chem. Corp., 728 F.Supp. 491, 493 (W.D.Tenn.1989); Winpisinger v. Aurora Corp. of Ill., Precision Castings Div., 456 F.Supp. 559, 566 (N.D.Ohio 1978).
 
 
 61
 Approximately 250 of the 500 New Blair members elected to switch some or all of their funds from the Equity Fund to the Short Term Investment Fund, and about 50 of the 150 Telemundo members made this election. The Equity Fund surplus of approximately $500,000 generated by the delay in switching accounts from that fund to the Short Term Investment Fund following the election was thereby attributable to members of both plans. Yet, Telemundo ignored the interests of the New Blair members, for whom it was acting as a fiduciary, and allocated the entire amount to the Telemundo participants, even though 83% of the 300 electing participants were in fact New Blair members. By allocating the entire surplus to the Telemundo Plan, Telemundo violated its fiduciary duty under Sec. 404 of ERISA to the New Blair participants. Telemundo should have apportioned the surplus between the two plans.
 
 CONCLUSION
 
 62
 For the reasons stated above, we find that Telemundo is liable to New Blair on both the Transfer Dates Claim and the Equity Fund Claim. Accordingly, we reverse the decision of the district court and remand for further proceedings consistent with this opinion.