SYSTEMS COUNCIL EM–3, INTERNATIONAL BROTHERHOOD of ELECTRICAL WORKERS, AFL–CIO, et al., Plaintiffs,

v.

AT & T CORP., et al., Defendants.

Civil Action No. 96–1117(GK).

United States District Court, District of Columbia.

Aug. 12, 1997.

25. *Children most vulnerable to fallout from nuclear tests,* USA TODAY, Aug. 4, 1997, at 7A, available in 1997 WL 7009781.

Richard B. Sigmond, Kent Cprek, Nancy A. Walker, Terrance E. Coles, Sagot, Jennings & Sigmond, Philadelphia, PA, David S. Barr, Barr, Peer & Camens, Washington, DC, for plaintiffs.

Joseph R. Guerra, Paul Zidlicky, Sidley & Austin, Washington, DC, Robert N. Ecccles, Karen M. Wahle, O'Melveny & Meyers, John J. Gallagher, Intra L. Germanis, Paul, Hastings, Janofsky & Walker, Washington, DC, Peter O. Shinevar, O'Melveny & Meyers, LLP, New York City, for defendants.

### *MEMORANDUM OPINION*

KESSLER, District Judge.

This matter is before the Court upon the Motions of Defendants AT & T Corporation, the AT & T Employees' Benefit Committee and the other AT & T employee benefit entities identified in the Complaint [1] (collectively, "AT & T") and Defendant Lucent Technologies, Inc. ("Lucent") to Dismiss the

---

1. These Defendants are: the AT & T Employees' Benefit Committee (the administrator, under ERISA, of the pension and welfare plans); the AT & T Pension Plan and the AT & T Management Pension Plan, which are funded by Defendant AT & T Master Pension Trust; the AT & T Medical Expense Plan for Retired Employees, the AT & T Dental Expense Plan for Retired Employees, the American Telephone and Telegraph Company (AT & T) Health Plans Benefit Trust, the American Telephone and Telegraph Company Represented Employees Post–Retirement Health Benefits Trust, the American Telephone and Telegraph Company Management and Non–Represented Employees Post–Retirement Health Benefits Trust, the AT & T Group Life Insurance Program, the AT & T Supplementary Life Insurance Plan and the AT & T Long–Term Care Plan for Retired Employees; and John Does and Jane Roes, in their capacities as administrators and fiduciaries acting on behalf of the plans.

Complaint [# 42, # 44].[2] Plaintiffs bring this action for violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and common law breach of contract. Upon consideration of the Defendants' Motions, the Plaintiffs' Opposition, Defendants' Replies, Plaintiffs' Surreply, the various supplemental pleadings filed by the parties, the arguments of counsel in open court on July 31, 1997, and the entire record herein, for the reasons discussed below, defendants' Motions to Dismiss are granted.

## I.  *Background*

Plaintiffs are current and retired employees of AT & T and Lucent, prospective retirees and spouses of both Defendants, and the unions that represent them (the "Unions").[3] Together, the Unions represent approximately 16,000 individuals. More than 300,000 individuals are entitled to receive benefits from the pension and welfare plans. Compl. ¶ 1.

### A.  The Bell System Divestiture

AT & T is a successor to the American Telephone & Telegraph Company and Bell System. During the 1970's and 1980's the Bell System regional operating companies of the American Telephone and Telegraph Company were divested from AT & T.[4] That divestiture was carried out pursuant to a plan of reorganization approved by this Court. *United States v. Western Elec. Co.,* 569 F.Supp. 1057 (D.D.C.) (J. Greene), *aff'd sub nom., California v. United States,* 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983).[5]

As part of the Bell System divestiture, pension assets and liabilities were transferred from AT & T to new pension plans "sponsored"[6] by the regional holding companies. AT & T accomplished this transfer in compliance with the safe harbor assumptions and procedures set forth by the Pension Benefit Guarantee Corporation ("PBGC") under 29 C.F.R. Part 2619 and related regulations in effect at the time of the divestiture. Under the divestiture, some employees of the American Telephone & Telegraph Co. and the Bell System were "assigned" to the new regional holding companies.

Before the divestiture, a practice known as "portability" allowed employees who transferred from one company to another company in the Bell System to carry with them their years of service with their prior Bell

2.  The Complaint also names Bankers Trust Company, the Chase Manhattan Bank, N.A., Citibank, N.A., Mellon Bank, N.A., the Northern Trust Company, State Street Bank and Trust Company, and Telephone Real Estate Equity Trust as Rule 19 Defendants who risk incurring double, multiple, or inconsistent obligations with respect to assets held by them in trust for the various benefit plans. Fed.R.Civ.P. 19(a)(ii). Bankers Trust was dismissed by Stipulation of Dismissal on July 14, 1996.

3.  Plaintiffs have filed for class certification in this action. Pursuant to the Court's Order of October 22, 1996, the non-Rule 19 Defendants were given 90 days from the date of this decision to respond to that application. However, in light of the Court's decision on Defendants' Motions to Dismiss, the Motion for Class Certification [# 59] is now moot.

4.  The Bell System was split into several regional holding companies: Ameritech, Bell Atlantic Corporation, BellSouth Corporation, NYNEX Corporation, Pacific Telesis Group, Southwestern Bell Corporation, Pacific Telesis Group, Southwestern Bell Corporation and U.S. West Inc.

5.  The Department of Justice had initiated antitrust proceedings against the American Telephone & Telegraph Company and several other entities. After a lengthy period of time, the parties entered into a consent decree, which was approved by Judge Harold Greene. *See United States v. American Tel. & Tel. Co.,* 552 F.Supp. 131, 135–140 (D.D.C.1982), *aff'd sub nom, Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). The reorganization plan and Bell System divestiture grew out of that consent decree. *See generally Western Elec., supra,* 569 F.Supp. 1057.

6.  29 U.S.C. § 1002(16)(B) defines plan sponsor as:

(i) the employer in the case of an employee benefit plan established or maintained by a single employer, (ii) the employee organization in the case of a plan established or maintained by an employee organization, or (iii) in the case of a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organizations, the association, committee, joint board of trustees, or other similar group of representatives of parties who establish or maintain the plan.

System employer for pension and seniority purposes. *See generally Western Elec.*, 569 F.Supp. at 1091–94. At the time of the divestiture, AT & T and the regional holding companies entered into the Divestiture Interchange Agreement (the "DIA"). The DIA provided for the continued portability of pension rights for most employees who transferred between the divested companies during calendar year 1984. *See id.* at 1094 n. 158. Judge Greene's decision and the accompanying DIA extended portability only through 1984. In 1984, Congress passed the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 900 (1984), which codified, with some modifications, certain aspects of the DIA. It provides that:

> [n]otwithstanding any provision of the [DIA] to the contrary, in the case of any change in employment on or after January 1, 1985, by a covered employee, the recognition of service credit, and enforcement of such recognition, shall be governed in the same manner and to [the] same extent as provided under the [DIA] for a change in employment by a covered employee during calendar year 1984.

*Id.* In response to the new statute, AT & T and the regional operating companies entered into the Mandatory Portability Agreement (the "MPA"). Among other provisions, the MPA requires that when a "covered employee" moves from AT & T or one regional operating company to another, the former employer must transfer to the new employer assets sufficient to fund the pension obligations assumed by the latter company.

After the divestiture, AT & T also established its own welfare plan trusts for both union and non-union employees to fund welfare benefits[7] for present and future retirees.[8] The trusts were financed, in part, by a transfer of assets from the AT & T Pension Plan and the AT & T Management Pension Plan. That transfer was accomplished in accordance with 26 U.S.C. § 420 and an agreement with the collective bargaining representatives for the union employees, including Plaintiff Systems Council EM–3. Once the welfare trusts were established and the corresponding assets had been transferred, employees of AT & T and its affiliates who retired did so in reliance on AT & T's promise of continued benefits. Compl. ¶¶ 6(i)–(k), 17–18.

## B. The Current Dispute

In 1995, Congress changed the regulation of the telecommunications industry. In response to these legislative changes, as well as other economic and business factors, AT & T announced in the fall of 1995 that it would undertake a strategic restructuring pursuant to which AT & T would separate into three publicly traded businesses: AT & T would focus on communications services; Lucent would focus on communications systems; and NCR Corporation would focus on transaction intensive computing.[9] Compl. ¶ 19.

Lucent was incorporated on January 4, 1996. Although it is a publicly traded company, it is under the control of AT & T for the purposes of ERISA, section 29 U.S.C. § 1301(b). Thus, AT & T is considered a "single employer" of the employees of AT & T and Lucent. Compl. ¶ 20.

A February 1, 1996, Employee Benefits Agreement ("EBA"), signed and delivered by Lucent, governs the employee benefit obligations of AT & T and Lucent with respect to the benefit plans already established by AT & T and similar employee benefit plans Lucent will establish. The EBA provides that employees and retirees assigned to Lucent in the reorganization will continue to

---

7. Under ERISA, welfare benefits include "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds or prepaid legal services", 29 U.S.C. § 1002(1)(A), but expressly excludes pensions on retirement or death and insurance to provide such pensions. 29 U.S.C. § 1002(1)(B).

8. These trusts are qualified voluntary employee beneficiary associations within § 501(c)(9) of the Internal Revenue Code and are thus eligible for certain tax exemptions.

9. The AT & T–NCR split is proceeding on a different time table than the AT & T–Lucent split. Thus, NCR is not a party to this litigation and any agreements between it and AT & T are in no way implicated in this suit.

participate in the AT & T benefit plans until all of the common stock of Lucent owned by AT & T is "spun-off" from AT & T and distributed to individual AT & T stockholders.[10] At the time of the distribution, Lucent will no longer be under the common control of AT & T, as that term is defined by ERISA, 29 U.S.C. § 1301(b). Compl. ¶ 21.

The EBA also governs Lucent's responsibility for payment of employee pension and welfare benefit obligations. After the distribution of Lucent stock from AT & T to individual AT & T stockholders, Lucent will be responsible for administering and paying all benefit obligations for its employees and retirees, that is, those employees and retirees assigned to Lucent in the restructuring. Lucent will be delegated benefit responsibilities for those employees who had been employed in the businesses transferred to Lucent or who are otherwise assigned for employee benefit allocation purposes to Lucent. Lucent will establish its own pension and other employee benefit plans, which will generally be the same in form as the AT & T plans. However, the EBA allows Lucent to discontinue or change its pension and welfare plans in the future without regard to the level of benefits being provided to AT & T employees and retirees at the time of such amendment. Compl. ¶ 22–23.

The EBA provides for the distribution of the assets of the AT & T pension plans between those plans and plans Lucent will establish. The methodology for determining the division of assets between the AT & T and Lucent plans differs from that used to distribute benefit plan assets in the Bell System divestiture. However, the EBA provides that the actuarial assumptions used must be the same as those used by AT & T to determine the minimum funding requirements for its pension plans under § 302 of the ERISA, 29 U.S.C. § 1082, and § 412 of the Internal Revenue Code, 26 U.S.C. § 412. EBA § 8.2(a). Those assumptions are required, by law, to be reasonable. *See* 26 U.S.C. § 412(c)(3)(A)(i). Further, the EBA allocates any surplus pension assets equally between the AT & T and Lucent pension plans. EBA § 3.2. Plaintiffs contend that

the methodology embodied in the EBA "may" unlawfully favor AT & T. Compl. ¶¶ 6(d)-(e), 24.

AT & T has also directed that those assets allocable to the retirees and employees assigned to Lucent which are held in AT & T's welfare plan trusts and other welfare plans are to be transferred to a corresponding trust or other funding vehicle established by Lucent. Plaintiffs contend that the liabilities being transferred to Lucent (i.e., the benefits that Lucent will be responsible for paying to employees and retirees) are disproportionate to those being retained by AT & T. They further contend that the actuarial assumptions being used to determine the allocation of assets in the division do not give priority to cash needs for present retirees. Compl. ¶ 25.

Under the EBA, Lucent is to appoint a nominally independent fiduciary. The fiduciary's duty is limited to a review of the accuracy of data, computations and application of the methodology provided in the EBA. The fiduciary will not have the authority to challenge the EBA's methodology and, according to Plaintiffs, will not be provided with sufficient resources to adequately review and implement the reorganization of the employee benefit plans. Compl. ¶ 26.

Plaintiffs object to the procedures to be used for division of pension plan assets in conjunction with the spin-off because they differ from the procedures used in the Bell System divestiture and provided for in the MPA and DIA. They further contend that the division of the welfare plan assets is in contravention of common law principles. Compl. ¶ 27. Plaintiffs filed this seven-count Complaint asserting Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, violations and common law breach of contract claims seeking declaratory, monetary, and injunctive relief. Most specifically, they seek appointment of an independent fiduciary to review the procedures and assumptions associated with the spin-off of the AT & T plans. AT & T's and Lucent's Motions to Dismiss are now before the Court.

---

10. That distribution was scheduled to occur no    later than December 31, 1996.

## II. Standard of Review

Defendants have moved under Fed. R.Civ.P. 12(b)(6) to dismiss Plaintiffs' Complaint because it does not state a cause of action. Plaintiffs' "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The factual allegations of the complaint must be presumed true and liberally construed in favor of Plaintiffs. *Shear v. National Rifle Ass'n of Am.,* 606 F.2d 1251, 1253 (D.C.Cir.1979).

Plaintiffs are, understandably, concerned—both personally and institutionally—about the full ramifications of this very large, complex commercial transaction involving the transfer of more than $40 million in assets. The question, at this early point in the proceedings, is whether Plaintiffs have stated a cause of action. ERISA is a highly technical statute and it is the Court's job to "apply it as precisely as [it] can, rather than to make adjustments according to a sense of equities in a particular case." *Johnson v. Georgia–Pac. Corp.,* 19 F.3d 1184, 1190 (7th Cir.1994) (citing *John Hancock Mut. Life Ins. Co. v. Harris Trust & Savs. Bank,* 510 U.S. 86, 110, 114 S.Ct. 517, 531, 126 L.Ed.2d 524 (1993)). Rhetorical or emotional arguments voicing fears about the future or decrying the absence of oversight by an independent fiduciary simply cannot substitute for rigorous analysis of the pertinent statutory provisions. With these concepts in mind, the Court turns to the substance of Plaintiffs' claims.

## III. Analysis

### A. Union standing

■ Defendants contend that the Union Plaintiffs do not have standing to bring a civil action under ERISA. Section 502 of FRISA, 29 U.S.C. § 1132, enumerates those classes of persons who may bring an ERISA civil action: "(1) a participant or beneficiary, (2) the Secretary of Labor, and (3) a fiduciary." *Chemung Canal Trust Co. v. Sovran Bank/Maryland,* 939 F.2d 12, 14 (2d Cir. 1991), *cert. denied,* 505 U.S. 1212, 112 S.Ct.

3014, 120 L.Ed.2d 887 (1992). It is clear that this statutory list is exclusive. *See Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 27, 103 S.Ct. 2841, 2855–56, 77 L.Ed.2d 420 (1983) (ERISA "does not provide anyone other than participants, beneficiaries, or fiduciaries with an express cause of action"); *Grand Union Co. v. Food Employers Labor Relations Ass'n,* 808 F.2d 66, 71 (D.C.Cir.1987). Thus, under the plain language of the statute, the Union Plaintiffs do not have standing to bring an ERISA action.

It is true, as Plaintiffs contend, that unions have standing as associations to bring actions on behalf of their members. *See Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). However, *Warth* and the other cases cited by Plaintiffs explore the constitutional limitations on standing, not the statutory limits that are in issue here.

Plaintiffs rely on *Communications Workers of Am. v. AT & T,* 828 F.Supp. 73, 74–75 (D.D.C.1993), *rev'd on other grounds and vacated,* 40 F.3d 426 (D.C.Cir.1994). In *Communications Workers,* the defendant corporation challenged the standing of the plaintiff labor organization to sue on behalf of its members. The district court rejected defendants' arguments, stating that the express language of ERISA section 502 did not preclude the union from bringing suit on behalf of its members. *Id.* at 74–75. The Court of Appeals reversed the district court's decision on other grounds, noting in a footnote, without any analysis, that "[o]nce CWA-represented employees have exhausted their administrative remedies under the Plan, CWA will acquire representational standing to sue on behalf of its members under section 502 of ERISA." *Communications Workers,* 40 F.3d at 434 n. 2.

Both the opinion of the district court and the dicta in the Court of Appeals' decision in *Communications Workers* failed even to mention *Grand Union.* Both are in conflict with its holding. Moreover, in *Grand Union,* then-Judge Ginsburg carefully considered, and rejected, a contrary line of cases which did allow non-enumerated parties to sue under ERISA. *Id.* at 71–72. By contrast, the Court of Appeals in *Communications Work-*

*ers* did not squarely address the issue of union representational standing. In light of the clear holding of *Grand Union,* the Court concludes that the union Plaintiffs, who are not enumerated parties under ERISA, do not have standing to maintain an ERISA claim.

### B. Claims Against Lucent

Lucent moves to dismiss the Complaint in its entirety or, alternatively, that it remain a defendant solely for the limited purposes of Fed.R.Civ.P. 19. Lucent correctly contends that the Complaint alleges no violation of law by nor seeks any relief from Lucent. Specifically: (1) Lucent is not a fiduciary of any AT & T plan, so it cannot be liable for a prohibited transaction under Counts I, IV and VII; (2) Lucent is not responsible for the allocation of the plan assets in the spin-off under Counts II and III; and, (3) any claims to post-retirement welfare benefits in Count V run only against AT & T, not Lucent.

Plaintiffs' only response to Lucent's arguments is a conclusory statement that "Lucent is a proper party Defendant".[11] This is insufficient to overcome Lucent's arguments. Given Lucent's acknowledgment that it is a proper Rule 19 defendant, all claims against it in other than its Rule 19 capacity are dismissed.

### C. Breach of Fiduciary Duties (Counts I, IV, and VII)

In Counts I, IV, and VII of their Complaint, Plaintiffs allege that Defendants have engaged in a transaction prohibited by ERISA and have breached their fiduciary duties with respect to the AT & T pension and welfare plans. These alleged ERISA violations arise from the transfer of assets necessitated by the spin-off of the Lucent pension and welfare plans resulting from AT & T's reorganization.[12]

Defendants argue that Counts I, IV, and VII are legally insufficient because ERISA imposes no fiduciary duties on an employer who amends a plan and allocates the assets of that plan pursuant to a spin-off. In particular, Defendants contend that ERISA section 208, 29 U.S.C. § 1058, which governs the transfer of plan assets, does not impose fiduciary duties on transferors, but only establishes minimum funding requirements. They argue, further, that, to state a cause of action under the fiduciary duty sections of ERISA, implicated in Counts IV and VII of Plaintiff's Complaint, the acts challenged by Plaintiffs must be fiduciary in nature. However, Plaintiffs contend that the prohibited transaction and conflict of interest provisions, implicated in Count I of their Complaint, do not require the challenged act to be fiduciary in nature in order to state a cause of action.

The Supreme Court's decision in *Lockheed Corp. v. Spink,* —— U.S. ——, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996), makes it clear that a challenged act must be fiduciary within the meaning of ERISA before the ERISA protections invoked by Plaintiffs attach. In *Spink,* the Supreme Court faced the issue of whether conditioning payment of benefits under an early retirement program on the participants' release of employment related claims was a prohibited transaction under § 406(a) of ERISA, 29 U.S.C. § 1106(a). *Id.* at ——, 116 S.Ct. at 1786. Section 406 prohibits a "fiduciary with respect to a plan ... [from] caus[ing] the plan to engage in a transaction, if he knows or should know that such a transaction constitutes a direct or indirect ... transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D). The Court stated that a violation of § 406 requires a plaintiff to show that the fiduciary caused the plan to engage in the allegedly unlawful transaction. *Spink,* —— U.S. at ——, 116 S.Ct. at 1788. Thus, a threshold issue was whether fiduciary status existed. *Id.* at ——, 116 S.Ct. at 1789.

**11.** Although this statement is found in Plaintiffs' Response to Motion to Dismiss of Defendant Lucent Technologies, Inc., it is not even mentioned in Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss, much less supported by any legal authority.

**12.** A spin-off is "the splitting of a single plan into two or more plans." 26 C.F.R. § 1.414(*l*)–1(b)(4).

Plaintiffs claim that *Spink* is inapposite because the Supreme Court was determining duties with respect to ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), and that Count I of their Complaint arises under ERISA § 406(b), 29 U.S.C. § 1106(b), and Counts IV and VII arise under ERISA § 404, 29 U.S.C. § 1104. That argument is unpersuasive for the following reasons.

*Spink* did concern liability under § 406(a)(1)(D), which prohibits certain acts by a fiduciary. However, to determine whether the employer was acting as a fiduciary, the Court felt it necessary to analyze and apply the definition of fiduciary set forth in the general definitions section of subchapter I of ERISA. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).[13] That definition applies to *all* provisions of ERISA subchapter I, "Protection of Employee Benefit Rights",[14] *see* 29 U.S.C. § 1002, and, thus, *all* portions of ERISA dealing with fiduciaries. *See Spink,* —— U.S. at ——–—— & n. 2, 116 S.Ct. at 1788–89 & n. 2.

It is clear from the plain language of the statute that both the duty to refrain from engaging in prohibited transactions, set forth in § 406, and the general fiduciary duties, set forth in § 404, are triggered only if the participant involved is a fiduciary within the meaning of the statute. 29 U.S.C. § 1106 ("A fiduciary with respect to a plan shall not ... "); 29 U.S.C. § 1104 ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... "). Thus, as in *Spink*, the threshold inquiry as to Counts I, IV, and VII

of Plaintiffs' Complaint is whether fiduciary status existed. For liability to attach, Defendants must have acted in a fiduciary capacity as to each count which charges a violation of § 404 or § 406(a) or (b). *Accord Varity Corp. v. Howe,* —— U.S. ——, ——, 116 S.Ct. 1065, 1071, 134 L.Ed.2d 130 (1996); *John Hancock,* 510 U.S. at 96, 114 S.Ct. at 524 ("Congress commodiously imposed fiduciary standards on persons whose *actions* affect the amount of benefits retirement plan participants will receive") (emphasis added); *Walling v. Brady,* 119 F.3d 233, 237 (3d Cir.1997) ("ERISA is concerned with the administration of benefit plans and not with the precise design of the plan.") (citations and internal quotations omitted).

In their Opposition to Defendants' Motions to Dismiss, Plaintiffs make it clear that their challenge is to AT & T's allocation of plan assets and liabilities resulting from the spinoff of Lucent and its benefit plans. Thus, the Court must determine whether that act is fiduciary in nature. If it is, then Plaintiffs have stated claims in Counts I, IV, and VII of their Complaint.

Defendants argue that the decision to restructure the AT & T businesses and spin-off their benefit plans was a business decision not subject to the fiduciary standards of ERISA. They contend that any allocation and transfer of assets between the plans are ministerial acts intended to implement that transfer, not fiduciary acts. Plaintiffs strenuously argue that the allocation of plan assets and liabilities between the AT & T and Lucent plans is a fiduciary act.

---

**13.** ERISA § 3(21)(A) provides that:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

**14.** ERISA is set forth at 29 U.S.C. Chapter 18. It is composed of three subchapters. Subchapter I

is titled "Protection of Employee Benefit Rights"; subchapter II is titled "Jurisdiction, Administration, Enforcement; Joint Pension Task Force, Etc."; subchapter III is titled "Plan Termination Insurance."

Subchapter I, Subtitle A sets forth the general provisions applying to the protections of employee benefit rights. Subtitle B encompasses five parts: (1) Reporting and Disclosure; (2) Participation and Vesting; (3) Funding; (4) Fiduciary Responsibility; (5) Administration and Enforcement. *See* 29 U.S.C. § 1001–1003, 1021–1031, 1051–1061, 1081–1086, 1101–1114, 1131–1145.

ERISA § 406(b), 29 U.S.C. § 1106(b), which sets forth ERISA prohibited transactions, as well as the fiduciary duty provisions of ERISA § 404, 29 U.S.C. § 1104, are all contained in ERISA subchapter I, subtitle A, part 4.

**30**

The Court looks first at ERISA's broad definition of fiduciary, contained in ERISA § 3(21)(A). It provides, in relevant part, that a "person is a fiduciary with respect to a plan", and therefore subject to ERISA fiduciary duties, "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

■ AT & T acts as both an employer and a plan administrator, as permitted under ERISA. *See Varity Corp.,* — U.S. at ——, 116 S.Ct. at 1071. However, not all of AT & T's business activities involve plan management or administration. *See, e.g., United Steelworkers of Am., Local 2116 v. Cyclops Corp.,* 860 F.2d 189, 198 (6th Cir.1988); *Phillips v. Amoco Oil Co.,* 799 F.2d 1464, 1471 (11th Cir.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987); *Amato v. Western Union Int'l, Inc.,* 773 F.2d 1402, 1417 (2d Cir.1985), *cert. dismissed,* 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986). When "employers wear 'two hats' as employers and administrators, they assume fiduciary status only when and to the extent that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." *Blaw Knox Retirement Income Plan v. White Consol. Indus., Inc.,* 998 F.2d 1185, 1189 (3d Cir.1993) (quoting *Payonk v. HMW Indus., Inc.,* 883 F.2d 221 (3d Cir.1989) (internal citations and quotations omitted)).

■ Under prevailing ERISA law, it is clear that whether a party acts as a fiduciary is to be determined with respect to each particular activity at issue. *See, e.g., Maniace v. Commerce Bank,* 40 F.3d 264, 267 (8th Cir.1994), *cert. denied,* 514 U.S. 1111, 115

S.Ct. 1964, 131 L.Ed.2d 854 (1995); *Georgia–Pac.,* 19 F.3d at 1188; *Coleman v. Nationwide Life Ins. Co.,* 969 F.2d 54, 61 (4th Cir.1992), *cert. denied,* 506 U.S. 1081, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993); *Arakelian v. National W. Life Ins. Co.,* 748 F.Supp. 17, 22 (D.D.C.1990) (citation omitted). Defendants argue that neither plan amendment nor allocation of assets are fiduciary actions, but are settlor functions not subject to the fiduciary standards of ERISA.[15]

■ Under ERISA, a plan sponsor is free, "for any reason at any time, to adopt, modify, or terminate welfare plans" and does not act in a fiduciary capacity when it does so. *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 77–79, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995) (expressly approving *Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 947 (6th Cir.), *cert. denied,* 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990)). This is because, under trust law principles, there is a distinction between those actions creating, altering or terminating a trust, which are deemed settlor functions, and those actions managing and administering the investment and use of the trust assets, which are deemed fiduciary functions. *See Spink,* — U.S. at —— ——, 116 S.Ct. at 1789–90. The settlor-fiduciary distinction had already been applied in the context of welfare plans, *see Curtiss–Wright,* 514 U.S. at 77–79, 115 S.Ct. at 1228, and was expressly extended to pension plans in *Spink. Id.* ("[W]e think that the rules regarding fiduciary capacity— including the settlor-fiduciary distinction— should apply to pension and welfare plans alike.").

■ Further, it is well settled that ERISA's fiduciary duties do not apply to the allocation and transfer of assets pursuant to a spin-off. *Blaw Knox,* 998 F.2d at 1189; *Bigger v. American Commercial Lines,* 862 F.2d 1341 (8th Cir.1988).[16] As the Third

**15.** Much of ERISA's language comes from the common law of trusts, which governed most benefit plans prior to the enactment of ERISA. *See Varity Corp.,* — U.S. at ——, 116 S.Ct. at 1070. Employers who adopt, modify, or terminate plans "are analogous to the settlors of a trust." *Spink,* — U.S. at ——, 116 S.Ct. at 1789 (citing *Georgia–Pac.,* 19 F.3d at 1188).

**16.** Plaintiffs argue that, although AT & T is free to decide to divide its employees and businesses, it "crossed the line" and became a fiduciary when it decided to "invade the trust corpus" to allocate assets. This argument, however, proves too much. Under this rationale, any otherwise non-fiduciary act would be transformed into a fiduciary act simply because trust assets were

Circuit has stated regarding the distinction between fiduciary and settlor functions, " 'Discretion' for the purpose of determining the applicability of fiduciary obligations means solely that the plan administrator is making a choice reserved to it by the plan document in administering the plan, not tinkering with the plan document itself." *Walling,* 119 F.3d at 238.

■ There are two types of benefit plans under ERISA: defined contribution plans and defined benefit plans. A defined contribution plan is one in which the plan:

provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

29 U.S.C. § 1002(34). Thus, the individual plan owner "holds his or her own account and the eventual benefits received by the plan member are tied exclusively to the level of earnings on those funds during the life of the plan." *John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan,* 26 F.3d 360, 363 (2d Cir.1994). By contrast, a defined benefit plan is one in which an individual does not own the assets of the plan, but "a promise of benefits", and the employer bears the investment risk associated with the assets of the plan. *Georgia–Pac.,* 19 F.3d at 1186. The plans in this case are defined benefit plans.

Given this distinction, the reasoning and holding of *Bigger, supra,* are particularly instructive. In *Bigger,* the participants and beneficiaries of a spun-off pension plan contended that the employer breached a fiduciary duty when it failed to spin-off surplus assets from the original defined benefit plan to the new plan. 862 F.2d at 1342. Where a spin-off of a defined benefit plan occurs, section 208 of ERISA, 29 U.S.C. § 1058, requires that the employer fully fund the spun-

off plan so that each participant receives a benefit equal to or greater than their entitlement before the spin-off. Looking to the language and legislative history of the fiduciary duty and spin-off provisions of ERISA, the Eighth Circuit held that the fiduciary duty provisions of § 404 do not apply to a spin-off of plan assets, so long as the provisions of ERISA § 208 are complied with. *Bigger,* 862 F.2d at 1344–47. *See also Faircloth v. Lundy Packing Co.,* 91 F.3d 648, 657 (4th Cir.1996), *cert. denied,* ⸻ U.S. ⸻, 117 S.Ct. 738, 136 L.Ed.2d 677 (1997); *Kuper v. Iovenko,* 66 F.3d 1447, 1456 (6th Cir.1995). In other words, Congress has enacted ERISA section 208, 29 U.S.C. § 1058, as the specific means by which to challenge a plan spin-off.

Plaintiffs cite *John Blair,* 26 F.3d at 365, 367, for the proposition that a spin-off is subject to the fiduciary standards of ERISA. However, *John Blair* is distinguishable. First, the employer in *John Blair* had conceded its fiduciary status. *Id.* at 367. Second, the Second Circuit recognized the important distinction between defined-benefit plans, like those at issue here, and the defined contribution plans at issue in *John Blair:*

In both *Koch Indus., Inc. v. Sun Co.,* 918 F.2d 1203 (5th Cir.1990), and *Bigger v. American Commercial Lines,* 862 F.2d 1341 (8th Cir.1988), the courts examined the effect of a spinoff on defined benefit plan beneficiaries.... Examining the differences between defined benefit and defined contribution plans, both courts concluded that, unlike a defined contribution plan where a beneficiary's level of benefits depends on the assets retained in his or her individual account, with a defined benefit plan "the level of benefits does not depend on the amount of funds transferred." *Koch,* 918 F.2d at 1206; *see also Bigger,* 862 F.2d at 1345 ... In neither case did employees have "individual 'ac-

---

involved. Certainly the establishment and termination of a plan involves plan assets; however, those acts are clearly not subject to ERISA's fiduciary duty provisions. *See e.g., Spink,* ⸻ U.S. at ⸻, 116 S.Ct. at 1789; *Curtiss–Wright,* 514 U.S. at 77–79, 115 S.Ct. at 1228. Further, Plaintiffs apparently overlook the fact that the

protections of ERISA section 208, 29 U.S.C. § 1058, extend to plan benefits, not plan assets. *See e.g., Malia v. General Elec. Co.,* 23 F.3d 828 (3d Cir.), *cert. denied,* 513 U.S. 956, 115 S.Ct. 377, 130 L.Ed.2d 328 (1994); *Bigger,* 862 F.2d at 1341; *Flanigan v. General Elec.,* No. 93–CV–516 (D.Conn. Sept. 26, 1996).

count balances' that depended on investment returns." *Koch* at 1207. In both cases, ... individual plan members were guaranteed the same level of benefits as before the spinoff regardless of when the plan assets were transferred. Thus, both courts ruled that ... ERISA was not violated.... [I]f the Old Blair Plan were a defined benefit plan [ ] it would matter little to the individual New Blair Plan members whether the plan lost out on roughly $500,000 as long as those members were guaranteed their promised benefits at retirement.... However, because the level of benefits in a defined contribution plan is materially affected if the interim gains are not transferred, the analysis used in defined benefits cases is inapposite. *John Blair*, 26 F.3d at 366–67.[17]

Since the AT & T plans and the Lucent plans are defined benefit plans, no employee of AT & T would benefit at the expense of Lucent's employees because each employee, regardless of who employs her after the spin-off, has the same entitlement as before the split even assuming, *arguendo*, that AT & T retained the fund surplus. Put simply, "neither group of employees is preferred over the other and hence defendants have breached no fiduciary duty." *Foster Med. Corp. Employees' Pension Plan v. Healthco, Inc.*, 753 F.2d 194, 199 (1st Cir.1985).

Further, the transfer of assets does not involve the "management or disposition" of plan assets which triggers ERISA's fiduciary protections. *See Blaw Knox*, 998 F.2d at 1189–90. The Treasury Regulations [18] implementing ERISA draw a distinction between the transfer of assets and the management and disposition of assets. 26 C.F.R. § 1.414(*l*)–1 (b)(3). Under those regulations, a "transfer of assets" occurs only where assets in one plan are diminished and a separate plan experiences a corresponding gain. That type of transaction differs from the management of investments, which typically involves "common transactions ... dealing with a pool of assets." *Georgia–Pac.*, 19 F.3d at 1189.

Thus, under prevailing ERISA case law, AT & T's decisions to restructure itself and to spin-off its pension and welfare plans as part of the restructuring are settlor functions because they involve the amendment of a plan. Thus, those decisions and the actions necessary to implement them are not subject to ERISA's fiduciary standards.

The structure of ERISA itself further supports this conclusion. ERISA section 208, 29 U.S.C. § 1058, governs the transfer of assets between single employer plans. That section expressly permits transfers of assets and liabilities between pension plans, subject only to the minimum asset requirements of that section. *See Bigger*, 862 F.2d at 1344–47. ERISA imposes liability only if the plan sponsor does not comply with the statutory funding requirements imposed in section 208.[19] *See Blaw Knox*, 998 F.2d at 1185

17. Plaintiffs also rely on *Commissioner v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993), to support their argument that Defendants have engaged in a prohibited transaction. Even though *Keystone* dealt with an employer's contribution to a defined-benefit plan, it is not on point. First, that case was a tax case, not an ERISA case. Second, the issue which the Court considered was whether an employer's transfer of encumbered property to a plan to satisfy a debt owed the plan was a prohibited "sale or exchange" between a plan and a "disqualified person" and, thus, ineligible for favorable tax treatment. 508 U.S. at 158, 113 S.Ct. at 2011. The Court did not consider the issue of the employer's fiduciary status because the employer conceded that it was a disqualified person under relevant law. *Id.* at 158, 113 S.Ct. at 2011.

18. Where ERISA sections parallel sections of the Internal Revenue Code, the Secretary of Treasury, rather than the Secretary of Labor, has the authority to interpret those ERISA sections. *See Hurwitz v. Sher*, 982 F.2d 778, 779 n. 1 (2d Cir.1992) (citing Reorg. Plan No. 4 of 1978, § 101, 3 C.F.R. § 332 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9814 (transferring authority with regard to certain ERISA provisions from the Secretary of Labor to the Secretary of treasury)), *cert. denied*, 508 U.S. 912, 113 S.Ct. 2345, 124 L.Ed.2d 255 (1993). ERISA section 208 is the ERISA parallel to Internal Revenue Code § 414(a)(1) and is interpreted by Treasury Regulations. *Kinek v. Paramount Communications, Inc.*, 22 F.3d 503, 509–10 (2d Cir.1994) (citations omitted).

19. Plaintiffs complained at oral argument that Defendants' interpretation of the fiduciary provisions of ERISA would leave employees with no way to challenge a spin-off. However, it is clear that Congress provided section 208, on which

("compliance with ERISA's provisions for the funding of merged, transferred or acquired pension plans as set forth in 29 U.S.C. § 1058 preclude[s] a finding that a fiduciary breach had occurred"). In short, Congress has specifically allowed plan spin-offs and has established standards to govern them. In the absence of specific language imposing additional duties on plan sponsors, this Court concludes that section 208 does not prohibit the specific type of transaction here at issue. *Accord, Waller v. Blue Cross of Ca.*, 32 F.3d 1337, 1346 (9th Cir.1994) (rejecting breach of fiduciary duty claim based on transaction specifically permitted by ERISA).

Further, section 208 is not contained in ERISA's "Fiduciary Responsibility" section, *see* ERISA subtitle B, part 4, but in an entirely different part of subtitle B.[20] The fact that section 208 is not contained in the very section of ERISA which sets forth the responsibilities of fiduciaries is further evidence that AT & T is not acting as a fiduciary when it engages in the spin-off of plan assets specifically permitted under section 208, 29 U.S.C. § 1058.

The Ninth Circuit's decision in *Jacobson v. Hughes Aircraft Co.*, 105 F.3d 1288 (9th Cir. 1997), relied on by Plaintiffs, does not undermine this conclusion. Although the *Jacobson* plaintiffs had stated a claim for breach of fiduciary duty, that claim was predicated on the employer's use of assets attributable to employee contributions, rather than, as here, assets solely attributable to employer contributions. *Jacobson*, 105 F.3d at 1294. Plaintiffs contend that the *Jacobson* court has drawn a distinction between settlor and fiduciary functions based on whether the action affects "other people's money". *Jacobson* held that "when an employer is not the sole contributor of a pension plan, the employer does not have sole discretion to use the asset surplus of the plan." *Id.* at 1296. Here, since Plaintiffs did not make contributions to the plans, there can be no claim, as in *Jacob-* *son*, that Defendants have taken any improper actions with respect to "other people's money".

For all the foregoing reasons, Counts I, IV, and VII of Plaintiffs' Complaint must be dismissed.[21]

### D. Pension Plan Asset Allocation

Count II of Plaintiffs' Complaint alleges that the formula for allocating assets between the AT & T and Lucent pension plans violates ERISA. Defendants contend that none of the allegations of Plaintiffs' Complaint state a violation of ERISA. In support of their contention that the formula selected for allocating assets between the AT & T plans and the Lucent plans violates ERISA, Plaintiffs rely on sections 208 and 4044 of ERISA, 29 U.S.C. §§ 1058 and 1344.

Section 208 protects pension plan beneficiaries from losing benefits when plan assets are transferred to another plan. It provides that:

> A pension plan may not ... transfer its assets or liabilities to any other plan ... unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the ... transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the ... transfer (if the plan had then terminated).

29 U.S.C. § 1058. The Treasury Regulation implementing section 208 for spin-offs of defined benefit plans states that the equal benefit rule is satisfied if: (1) all of the accrued benefits of each participant are allocated to only one of the spun-off plans; and (2) the value of the assets allocated to each of the spun-off plans is not less than the sum of the present value of the benefits on a termination basis in the plan before the spin-off for all participants in the plan. 26 C.F.R. § 1.414(*l*)–1(n)(1). The term "benefits on a termination basis" means benefits that would

---

Plaintiffs rely in Count II of their Complaint, as the mechanism for making that challenge.

**20.** ERISA section 208, 29 U.S.C. § 1058, is found in Chapter 18, Subchapter I, Subtitle B, Part 2 of ERISA, which governs an employee's participation and vesting rights.

**21.** In light of the dismissal of Counts I, IV, and VII, Defendants' argument that the AT & T Employees' Benefit Committee is not a proper Defendant to these counts need not be addressed.

be provided by plan assets pursuant to ERISA section 4044 if the plan terminated. *Id.* § 1.414(*l*)–1(b)(5)(i). Section 4044 governs the distribution of residual plan assets in the event of a plan termination. In their complaint, Plaintiffs allege four separate violations of sections 208 and 4044.

### 1. Distribution of Residual Assets

■ The pension plans at issue in this suit have no provision directing the distribution of residual assets, if any, to AT & T in the event of a plan termination. However, the EBA provides that after sufficient assets have been transferred to fund those pension liabilities transferred to Lucent, residual assets, if any, will be distributed between the AT & T plans and the Lucent plans. EBA § 3.2(b)(i)(B).

Plaintiffs claim that the EBA violates section 208 because it does not allocate surplus assets proportionally to the "actuarial present value of benefits of the employees remaining in the AT & T Plan and those being transferred to the Lucent plans" in violation of 29 C.F.R. § 2618.32(a). That regulation, according to Plaintiffs, requires that residual assets be allocated proportionally between the AT & T and Lucent plans, based on the number of employees remaining in the AT & T plans and those being transferred to the Lucent plans. Defendants contend that under prevailing ERISA precedent there is no entitlement to residual assets so long as the level of benefits that participants in a defined benefit plan will receive after the spin-off remains constant.

As noted above, section 208 and its implementing regulation establish a "rule of benefit equivalence" so that the value of a participant's benefit before and after the spin-off must remain equal. *See Bigger,* 862 F.2d at 1344. Thus, whether Plaintiffs have stated a claim depends on whether, with respect to a defined benefit plan, section 208 protects only accrued benefits or whether it also protects an inchoate interest in the existing assets of a plan, even though the plan participants would have no claim to such assets unless the plan actually terminated.

Although several courts have addressed the related issues of surplus asset allocation in the context of consolidations and mergers, no case cited by either side addresses the issue with respect to spin-offs. Defendants offer several cases standing for the proposition that plan participants are entitled only to those assets required to satisfy their "accrued benefits" under the plan. *See, e.g., Malia,* 23 F.3d 828; *Bigger,* 862 F.2d at 1341; *Flanigan,* No. 93–CV–516 (D.Conn. Sept. 26, 1996); *Adams v. Ford Motor Co.,* 847 F.Supp. 1365, 1386 (E.D.Mich.1994); *In re Gulf Pension Litig.,* 764 F.Supp. 1149, 1185 (S.D.Tex.1991), *aff'd sub nom., Borst v. Chevron Corp.,* 36 F.3d 1308 (5th Cir.1994), and *cert. denied,* 514 U.S. 1066, 115 S.Ct. 1699, 131 L.Ed.2d 561 (1995). Defendants claim that, since the plans in issue are defined benefit plans, Defendants need not transfer any assets beyond those required to fulfill the new plans' obligation to the plan participants.

The reasoning of *Malia* is both instructive and persuasive. In that case, two pension plans were being merged and the beneficiaries of one of the original plans sought to have their benefits under the new, merged plans increased by a share of the residual assets that existed in their original plan at the time of the merger. The *Malia* court rejected the claim that ERISA sections 208 and 4044 should be read to give the beneficiaries a claim to the residual assets of the plan. In reaching its conclusion, the court discussed the distinction in ERISA's language between "benefits" and "assets", stating "[t]his language ... demonstrates clearly that 'benefits' are elements that are conceptualized and treated differently in a plan termination than are the 'assets' of that plan." *Malia,* 23 F.3d at 831–32. This distinction is sufficiently persuasive and supported by the language of both ERISA and its implementing regulations to defeat Plaintiffs' claim.

Plaintiffs quote *Kinek, supra,* 22 F.3d at 511, for the proposition that ERISA "unambiguously [provides] that plan participants are entitled ... to exactly what they would have received in the event of an actual termination." However, the Second Circuit rested its holding on the contractual provisions of the plans at issue and never reached the

question whether ERISA sections 208 and 4044 gave the plaintiffs any entitlement to residual assets. Thus, *Kinek* is of no help to Plaintiffs.

Given the reasoning of *Malia et al.* and the distinguishing features of *Kinek*, the Court concludes that, to the extent that Plaintiffs' claims are based on Defendants' alleged failure to distribute residual assets, their claim in Count II must fail and is dismissed.

### 2. Underlying Actuarial Assumptions

Plaintiffs' next contention challenges the actuarial assumptions underlying the EBA. First, they contend that the actuarial assumptions used in the EBA are not the "safe harbor" actuarial assumptions outlined in 29 C.F.R. Part 2619 (PBGC regulations).[22] They also contend that there is "no indication" that the assumptions used by AT & T are otherwise reasonable. Defendants argue that Plaintiffs have failed to state a cause of action because failure to use the PBGC's safe harbor provisions does not violate ERISA section 208 and, further, that Plaintiffs have failed to allege that Defendants' assumptions are unreasonable or in any other way contrary to the PBGC's requirements.

■ With respect to determining "benefits on a termination basis", Treasury Regulation § 1.414(*l*)–1(n), (b)(5)(ii) provides that:

the allocation of assets to various priority categories under section 4044 of ERISA must be made on the basis of reasonable actuarial assumptions. The assumptions used by the [PBGC] as of the date of the merger or spinoff are deemed reasonable for this purpose.

26 C.F.R. § 1.414(*l*)–1(n), (b)(5)(ii). Thus, by its plain terms, the regulation does not require that the PBGC's assumptions be used, only that they may be used as a safe harbor for the purposes of the relevant calculations. Our own Court of Appeals in an analogous context, that of securities laws, has ruled that noncompliance with optional "safe harbor" securities regulation does not fore-

close compliance with the statute. *Securities Indus. Ass'n v. Board of Governors*, 807 F.2d 1052, 1064 (D.C.Cir.1986), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987). *Accord Gillis v. Hoechst Celanese Corp.*, 889 F.Supp. 202, 205 (E.D.Pa.1995) (ERISA context).

■ Plaintiffs object to AT & T's use of ERISA's minimum funding standards to determine the proper amount to transfer. They rely on several PBGC interpretive guidelines that indicate that the PBGC has generally determined that reliance on an active plan's minimum funding standards will not lead to accurate calculation of the assets required to fund a plan that is being terminated. See 41 Fed.Reg. 48484, 48485 (Nov. 3, 1976); 40 Fed.Reg. 57982 (Dec. 12, 1975).[23] Plaintiffs quote at length from the PBGC's explanation of its conclusion:

In an ongoing plan, the valuation of both plan assets and liabilities is principally directed towards determining the contributions required by the employer to fund both current and past pension benefits. Cash flow management in most business situations make it essential that pension contributions over a given period be reasonably predictable ... Thus, the valuation of assets and benefits in an ongoing plan frequently employs techniques designed to smooth out relatively short-term market fluctuations.... In selecting an interest rate for valuing plan benefits, the plan's actuary is likely to use a rate which reflects a conservative estimate of longer term investment returns rather than a rate which reflects current market opportunities and which would likely require frequent adjustments. In addition, uncertainties with respect to salary adjustments, employee turnover and other contingencies are likely to be compensated for by loading margins into the interest rate assumption, thereby lowering the effective interest rates.

---

**22.** The PBGC regulations have recently been re-numbered. This Opinion, like the pleadings filed in this case, uses the prior numbering, as reflected in the current version of the Code of Federal Regulations.

**23.** Plaintiffs also rely on letters from the PBGC to actuaries giving opinions as to the legality of specific transactions. Such reliance, however, provides no guidance to the Court because of the fact-specific nature of each transaction analyzed.

To value benefits upon termination, interest assumptions should reflect current market opportunities. This consideration alone would result in interest rates which differ from the rates used by ongoing plans. In addition, the margins which are frequently loaded into the interest assumption of ongoing plans as a hedge against such factors as salary adjustments and employee turnover are not applicable in the case of a termination where the benefits of participants are definitely determinable. Thus, it is to be expected that the interest assumptions used by the PBGC for valuing plan benefits will vary significantly from the interest assumptions used by plans for valuing plan benefits prior to their termination.

40 Fed.Reg. 87982 (Dec. 12, 1975).

However, Plaintiffs' argument again overlooks the distinction between an actual termination and a "constructive" termination for the purposes of calculating spin-off asset requirements. The new Lucent plans will be "ongoing" plans which will have all of the variables noted by the PBGC. Thus, the rationale behind requiring different valuation for a plan that is terminating and will have all of its assets and liabilities determined at a fixed point does not extend to plans which are being spun-off for the very reasons spelled out by the PBGC.

Plaintiffs also argue that "there is no indication that" the actuarial assumptions used by AT & T for determining the minimum funding requirements for pension benefits are based on commercial annuity costs, as

they claim is required by ERISA. However, Plaintiffs never actually allege that those assumptions are unreasonable.[24] Had Plaintiffs made such an allegation, they might well be entitled to explore their claim that Defendants' allocations and underlying assumptions are unreasonable. *Accord Flanigan, supra.* Instead, they merely request the appointment of an independent fiduciary to examine these assumptions simply because they "may not" be reasonable. Plaintiffs have provided no authority for the proposition that a private business transaction is subject to scrutiny and examination by an independent fiduciary simply because there is "no indication" that it is based on reasonable assumptions.[25] Because Plaintiffs have failed to put the reasonableness of Defendants' actuarial assumptions in issue, they have failed to state a claim for a violation of ERISA section 208.

To the extent that Count II of Plaintiffs' Complaint alleges a violation of ERISA section 208 for failure to use the PBGC's safe harbor provisions, it is dismissed. Failure to use those assumptions does not constitute a *per se* violation of ERISA. In addition, Count II must be dismissed because Plaintiffs, who have the burden of properly pleading their claim, have not challenged the reasonableness of the underlying assumptions and allocations.[26]

### 3. Timing of Asset Valuation

■ Plaintiffs' Complaint alleges that the allocation is improper to the extent that the valuation of assets is based on a hypothetical segregation rather than on the exact value of

---

24. Given the obligations of Fed.R.Civ.P. 11, the Court well understands that Plaintiffs may not have had "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances", for making such an allegation.

25. Plaintiffs cite several cases where an independent fiduciary has been appointed. However, those cases do not provide support for Plaintiffs' argument. In *Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir.1984), the Court merely stated that "fiduciaries may need to step aside, at least temporarily, from the management of assets where they face potentially conflicting interests." That Court did not require that the district court, on remand, appoint a fiduciary. In the other cases cited by Plaintiffs, the courts approved of voluntary agreements by parties to appoint an inde-

pendent fiduciary, but did not actually order such appointment. *See Kenny v. Quigg*, 820 F.2d 665, 667 (4th Cir.1987); *Martin v. Goldstein*, 775 F.Supp. 649 (S.D.N.Y.1991).

26. Plaintiffs also rely on ERISA sections 4063 and 4068. Section 4063 is inapplicable because, by its terms, it applies only to a single employer plan under multiple controlled groups. Prior to the spin-off, the AT & T pension plans were single employer plans under a single control group. After the spin-off, both the AT & T and Lucent pension plans will be single employer plans, each under a single control group. Further, section 4063 and 4068 apply only to actual plan terminations, not constructive terminations resulting from a plan spin-off. Therefore, neither provision is relevant to Plaintiffs' argument.

the assets at the time of the spin-off. The EBA provides for the assets of the AT & T plans to be valued and assigned to AT & T and Lucent "as soon as practicable after" the date that the Lucent stock is distributed to individual AT & T stockholders.[27] EBA § 3.2(b)(i). The actual segregation of assets will not take place on that date, but will "occur as soon as practicable after the calculation of such interests". EBA § 3.2(b)(iii). The EBA further provides that:

> the interests so calculated shall be adjusted as of the date of the actual segregation by AT & T to the extent necessary or appropriate to reasonably and appropriately reflect additional pension contributions, interest, investment gains and losses, and benefit payments and data corrections, enhancements, and computational refinements from Immediately [sic] after the Distribution Date [sic] through the date of the actual segregation of such interests.

EBA § 3.2(b)(iii).

Defendants rely on *Bigger*, 862 F.2d at 1348, for the proposition that these provisions of the EBA are consistent with ERISA section 208. The *Bigger* court examined a transfer of assets that occurred approximately eighteen months after the assets were valued.[28] Because "transferring plan assets on the effective date would be difficult if not impossible", section 208 was satisfied so long as the transferring company properly accounted for the investment performance of plan assets between the valuation date and the transfer date. *Id.*

Plaintiffs, however, contend that Defendants' arguments are unavailing because the EBA does not provide an absolute time limit for the valuation of assets and because it does not require the use of market values as the standard for "reasonable" or "appropriate" adjustments.[29] Plaintiffs cite *John Blair*, 26 F.3d at 365, in support of their argument that, under this clause, AT & T might improperly retain any interim return on investment if there is a significant investment gain in the interim period. *John Blair* addressed whether the transfer of assets in a spin-off of a defined contribution plan satisfied the requirements of section 208. The transferor company valued the relevant asset pool at approximately $22.3 million on June 30, 1988, but did not transfer the assets until at least three months later. When the company did transfer the assets, it did not account for any additional contributions or investment gains and transferred only $22.3 million dollars. The court found that, since the assets of the defined contribution plan belonged to the participants in that plan, any interim contributions or gain also belonged to the participants and, thus, the transferor company had wrongly "pocketed the difference which rightly belonged to" the participants. *Id.* at 365–66. However, in so concluding, the Court noted the difference between defined benefit and defined contribution plans and admitted that its conclusion would have been different if the plans at issue had, as in *Bigger*, been defined benefit plans. *Id.* at 366.

This case is on all fours with *Bigger*. AT & T is spinning off a defined benefit plan. Participants in defined benefit plans do not own the assets of the plan, but, rather, "a promise of benefits". *Georgia–Pac.*, 19 F.3d at 1186. Thus, they have no ownership interest in the assets of the plan, and the amount transferred must only be sufficient to provide "benefit equivalence" after the transfer. *John Blair*, 26 F.3d at 367.

Further, it would be almost impossible for AT & T to segregate the assets of the plans on the day that it values them. Even with respect to defined contribution plans, the Second Circuit has stated, "courts should not be overly concerned with pinning down an exact date of spinoff, especially when the presence of numerous, drawn out transfers makes this a formidable task. Rather, courts must ensure that participants' accounts do

---

**27.** As noted earlier, that distribution was scheduled to occur no later than December 31, 1996.

**28.** In *Bigger*, the valuation of plan assets and their effective transfer occurred on January 1, 1981, and the assets were actually transferred on June 30, 1982. 862 F.2d at 1348.

**29.** Plaintiffs indicated that this aspect of their claim might be resolved at some pretrial proceeding. As none of the parties have indicated that such a resolution has occurred, the Court will address the parties' contentions.

not become stagnant." *John Blair,* 26 F.3d 360. So long as AT & T accounts for investment gains and loss, and the EBA clearly contemplates that it will, it will be able to satisfy the dictates of section 208.[30] For these reasons, Plaintiffs have failed to state a claim and Defendants' motion must be granted with respect to Plaintiffs' timing and valuation claims.[31]

#### 4. Guarantee of Future Benefits

■ Plaintiffs' next contention is that the EBA violates ERISA because, after the spin-off, AT & T and Lucent may have different business experiences, including profits and losses, that could affect Lucent's ability to fund its plans to the same extent as AT & T.[32] Prevailing ERISA law holds that there is no requirement that the sponsor of an original plan transfer sufficient assets to guarantee future, non-vested benefits. *Bigger,* 862 F.2d at 1345; *Dougherty v. Chrysler Motors Corp.,* 840 F.2d 2, 3 (6th Cir.1988). Those cases are persuasive in the context of defined benefit plans and Plaintiffs' Opposition offers no argument or authority to the contrary. Thus, that part of Plaintiff's Complaint is dismissed.

#### 5. Conclusion

With respect to Count II of Plaintiffs' Complaint, Defendants' Motion to Dismiss is granted.

### E. Applicability of the MPA and the DIA (Count III)

Count III of Plaintiffs' Complaint is a common law breach of contract claim alleging that AT & T's division of pension plan assets violates the Mandatory Portability Agreement ("MPA") and the Divestiture Interchange Agreement ("DIA"). Defendants contend that the DIA and MPA are completely irrelevant to the transfers at issue in this case for several reasons.

First, Defendants contend that the DIA expired on December 31, 1984, for most employees, and on December 31, 1993, for the remaining employees covered by its terms. Thus, there can be no claims arising from the DIA because it cannot dictate the required asset allocations in any restructuring occurring after its expiration.

Second, Defendants argue that the MPA applies only to certain types of employee transfers. The type of transfer to which the MPA applies is a statutorily defined "change in employment" by a statutorily defined "covered employee" from one former Bell System company named in and party to the MPA and another such company.[33] However, the MPA expressly excludes transfers of employees between two commonly owned companies, such as AT & T and Lucent. MPA ¶ 2.6(d).

Finally, Defendants contend that, even if the MPA and DIA did apply to the transfers here at issue, those agreements preclude enforcement by third-party beneficiaries such as the Plaintiffs. See DIA § 9.9; MPA § 9.9. Thus, Plaintiffs would have no right to sue directly under the DIA or the MPA.

Plaintiffs' Opposition fails even to address these arguments. Given the absence of any opposing argument and the persuasiveness of Defendants' arguments, the Court concludes that Count III must be dismissed.

### F. Breach of Retiree Contracts (Count V) and Breach of Welfare Plans (Count VI)

In Count V of their Complaint, Plaintiffs allege that they retired relying on the repre-

---

**30.** If AT & T fails to adequately account for changes in asset value at transfer, Plaintiffs may have a claim that section 206 has been violated. However, any such claim is premature.

**31.** The *Bigger* court stated that "[plaintiff] presented no evidence that making an allocation effective one date and then transferring the assets at a later date was improper." 862 F.2d at 1348. Thus, *Bigger* leaves open the possibility that Plaintiffs may be entitled to present evidence that the interim valuation used by AT & T is

unreasonable. However, even if such a claim were viable, since the transfer has not yet occurred, it would not yet present a controversy ripe for judicial review.

**32.** The Court notes that the reverse could also well be true.

**33.** After the Bell System divestiture, the regional operating companies all became independently owned entities.

sentations of AT & T to provide pension and retiree medical, dental, life insurance, telephone reimbursement[34] and other benefits and that Lucent may not be able to carry out those obligations at some time in the future.[35] In Count VI, they allege that the EBA violates the terms of the AT & T welfare plans and other related documents. Defendants contend that neither claim is ripe for review.[36]

Defendants contend that any breach of contract claim with respect to the retiree contracts or welfare plans is not ripe for decision because Plaintiffs have failed to allege a current breach, and that granting Plaintiffs a declaratory judgment stating the extent of AT & T's liability in the event that Lucent is unable to provide benefits under the retiree contracts would violate Article III's requirement that a current case or controversy between the parties exist.

The doctrine of ripeness has an Article III component and a prudential component. *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C.Cir. 1996) ("*NTEU*"). The Article III component is closely linked to the doctrine of standing, and "shares the constitutional requirement that an injury-in-fact be certainly impending." *Id.*

Plaintiffs cannot satisfy Article III's requirements. Quite simply, they have not yet been injured, nor is such injury "certainly impending". Although they may feel uncertain about the future of the Lucent plans, such uncertainty is insufficient to give rise to an Article III injury in fact.

Even where a plaintiff satisfies this constitutional requirement, however, the prudential component of the doctrine requires a court to evaluate "the fitness of the issues for judicial consideration and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). As the Supreme Court has stated, the ripeness doctrine's rationale is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Id.* at 148, 87 S.Ct. at 1515.

To determine whether a particular case is prudentially ripe, the court applies the two prong test set forth in *Abbott Laboratories. Mountain States Tel. & Tel. Co. v. FCC*, 939 F.2d 1035, 1040 (D.C.Cir.1991); *NTEU*, 101 F.3d at 1431. Both prongs of the test must be satisfied before a court may hear a case and render a decision on the merits. *Chamber of Commerce of the U.S. v. Reich*, 57 F.3d 1099, 1100 (D.C.Cir.1995) (per curiam).

Under the "fitness of the issues" prong of *Abbott Laboratories*, the court must consider whether it or the parties would benefit from postponing review until the challenged issue has "sufficiently 'crystallized' by taking on a more definite form." *City of Houston, Tex. v. Department of Hous. & Urban Dev.*, 24 F.3d 1421, 1431 (D.C.Cir.1994) (quoting *Better Gov't Ass'n v. Department of State*, 780 F.2d 86, 92 (D.C.Cir.1986)).

Again, Plaintiffs have made no allegations to support a finding that their claim is prudentially ripe for review. They do not allege that individual Plaintiffs have ceased to receive benefits under either the pension or the welfare plans. Further, there is no allega-

---

**34.** Telephone reimbursement is not a welfare benefit protected by ERISA. *See* 29 U.S.C. § 1002(1).

**35.** Defendants initially argued that ERISA preempted Plaintiffs' claims for breach of retiree contracts. Defendants believed that Plaintiffs were advancing state common law claims, which are preempted by ERISA. 29 U.S.C. § 1144(a); *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 138, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990). The regulation of pension plans is "exclusively a federal concern." *Ingersoll–Rand*, 498 U.S. at 138, 111 S.Ct. at 482 (internal quotations and citations omitted). The Supreme Court has noted that the language and history of ERISA obligate the courts to develop a " 'federal common law of rights and obligations under ERISA-regulated plans.' " *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 1557–58, 95 L.Ed.2d 39 (1987)) (other citations omitted). In their Reply brief, Defendants fail to squarely address Plaintiffs' invocation of federal common law, noting that the court need not reach the issue because those claims are not ripe for review.

**36.** Defendants put forth other arguments in favor of dismissal of Counts V and VI, but the Court need only address this dispositive argument.

tion that AT & T promised not to delegate its obligations under the contract to a third party and, thus, there can be no claim of injury by the simple fact of delegation.[37]

Plaintiffs argue that they have stated a claim under the doctrine of anticipatory breach. Under that doctrine, a party may seek damages immediately if the other party signifies its intent to repudiate its obligations under the contract. Plaintiffs cite *Shell Offshore, Inc. v. Marr*, 916 F.2d 1040, 1049 (5th Cir.1990), and *United Corp. v. Reed, Wible & Brown, Inc.*, 626 F.Supp. 1255, 1257 (D.Vi.1986), to support their contention that their Complaint states a valid cause of action. However, as those cases make clear, there must be "an absolute and unequivocal refusal to perform" the contract. *Reed, Wible & Brown*, 626 F.Supp. at 1257 (internal quotations omitted); *Shell Offshore*, 916 F.2d at 1049. *See also Reiman v. International Hospitality Group, Ltd.*, 614 A.2d 925, 928 (D.C.1992); *Order of AHEPA v. Travel Consultants, Inc.*, 367 A.2d 119, 125 (D.C.1976), *cert. dismissed*, 434 U.S. 802, 98 S.Ct. 30, 54 L.Ed.2d 60 (1977); *Stanwood v. Welch*, 922 F.Supp. 635, 642 (D.D.C.1995). Not only is there no such allegation here, but Plaintiffs admit that the EBA's language on this issue is, at most, "ambiguous". Opp'n at 39 n. 19. Therefore, it is particularly inappropriate for the Court to hear this claim before it has crystallized.

The Sixth Circuit's decision in *Cyclops Corp., supra*, is instructive. There, individual plan participants and their union brought suit against an employer following the sale of a portion of the company's plan to a company involved in bankruptcy proceedings. *Cyclops Corp.*, 860 F.2d at 191. Despite the prospective pensioners' fear that the purchaser would be unable to fulfill its obligations under the contract, the court found that it was "far from clear that [the purchaser] will ever fail to meet its pension obligations." *Id.* at 195. Because "no pension payments or funding requirements ha[d] been neglected", the plaintiffs' claim was too dependent on "contingent future events that may not occur as

anticipated or indeed may not occur at all". *Id.* at 194 (internal citations and quotations omitted). As in *Cyclops Corp.*, the prospective liability of AT & T in the even Lucent cannot meet its obligations is a paradigmatic example of an issue that, if not "adjudicated at this time, [ ] may not require adjudication at all." *Friends of Keeseville, Inc. v. FERC*, 859 F.2d 230, 235 (D.C.Cir.1988).

Further, Plaintiffs cannot demonstrate any "hardship" from "withholding court consideration." *Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. at 1515. As long as Lucent provides benefits, Plaintiffs are not harmed. Again, Plaintiffs' uncertainties about Lucent's economic future are insufficient to give the court power to hear their claim.

For these reasons, Plaintiffs' breach of contract claims in Counts V and VI are neither constitutionally nor prudentially ripe and must be dismissed.

## IV. *Conclusion*

Plaintiffs' attempt to obtain independent review, both legal and fiduciary, of this very large private transaction must fail. Plaintiffs' concerns are undoubtedly, and understandably, motivated in large part by the enormous amount of assets involved. However, Plaintiffs have failed to recognize this Court's limited jurisdiction, especially with respect to private parties. This Court's function is not to provide judicial preclearance for private commercial transactions, no matter how large or far-reaching. Although Plaintiffs have argued strenuously that there is some inchoate right to fiduciary review for all transactions involving pension or welfare trusts, they have provided no concrete legal support for this proposition.

For the reasons discussed above, the Motions of the AT & T Defendants and Lucent to Dismiss [# 42, # 44] are granted.

An Order will issue with this Opinion.

---

**37.** It is a well-settled principle that, unless otherwise agreed by the parties, contract obligations may be delegated to a third party. *See* Restatement, Second, Contracts § 318, at 19 (1981). If the third party fails to perform, the person to whom the duty flows may have a cause of action against the delegating party. *See Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1278 (10th Cir.1994).